[No. 7746*.]

## STOCKMAN v. LEDDY, STATE AUDITOR.

1. CONSTITUTIONAL LAW—*Who May Assail Statute for Unconstitutionality*—When mandamus is instituted against a ministerial or executive officer, to compel performance of what is alleged to be a duty prescribed by statute, he may question the constitutionality of the enactment.

2. ——*Particular Statutes*—The act of May 11th, 1911, (Laws 1911, c. 227) assuming to make an appropriation of public money for the purpose of conducting an investigation by a committee of its own members, as to the measures necessary to be taken for the protection of certain property rights of the state, is void as an attempt to confer executive power on members of the legislative department in violation of article III of the constitution.

3. PUBLIC WATERS—*Rights of the State—Power of Legislature to Protect.* The natural streams of Colorado are non-navigable. Their entire volume is made up of the rains and snow which fall upon its surface. The state was therefore justified in asserting (Const. art. XVI § 5 its ownership of all these natural streams. Congress in the enabling act, and the President in proclaiming the admission of the state must be assumed to have been aware of the situation, and to have consented to the assertion of title so made by the state.

That the general assembly has the power, and is charged with the duty to protect the interest of the state in the natural streams, cannot be questioned. The public moneys may be appropriated for the protection and defense of the rights of the state, and its citizens, in these waters.

*En Banc. Error to District Court, City and County of Denver.*—HON. GREELEY W. WHITFORD, Judge.

Mandamus by Louis R. Stockman against Michael A. Leddy, State Auditor. Writ denied, and plaintiff brings error.

*Should have appeared in Vol. 54. Publication delayed by the failure of the reporter to receive the opinion.

(24)

Messrs. ELLIOTT & BARDWELL, and ROY C. HECOX, both of Denver, for plaintiff in error.

BENJAMIN GRIFFITH, Attorney General, and PHILIP W. MOTHERSILL, Assistant-Attorney General, for defendant in error.

HON. C. J. CAMPBELL delivered the opinion of the court:

The immediate object of this action in mandamus by Stockman against the Auditor of State is to compel the latter to issue to him a warrant in the sum of $55.75 for services which he rendered to a joint legislative committee created by an act of our general assembly. Session laws of 1911, p. 671, c. 227. The principal purpose of the action, however, appears to be to determine the constitutionality of the statute. The first section creates a joint legislative committee, "consisting of three members of the Senate and three members of the House of Representatives," the appointment of whom is to be "by the respective presiding officers thereof, to investigate the acts and claims of the Interior department, the Reclamation Service, and the Forest Service of the Federal Government, and to ascertain whether or not the right of this state to control the distribution of the waters thereof within its borders is thereby in any way unlawfully limited or interfered with or infringed upon, or about to be interfered with or infringed upon; to investigate and determine what claims are made by or upon behalf of any state or corporation or individual thereof to the waters of any stream or streams originating in or flowing in the state of Colorado to the detriment of the interests of this state and the citizens thereof or the appropriators and users of said waters; and to examine into all matters by which the state's right to control the waters thereof may be affected." By section 2, the committee may "authorize the prosecution or defense of such action or actions

as it may deem proper to determine or to protect the rights of the state in the matters aforesaid, and to employ counsel therefor; and to employ counsel to assist in the conduct of any private suit or suits now pending or hereafter begun in which any material question as to the rights of the state may, in the judgment of said committee, be involved and properly determinable; and said committee may employ counsel to advise it as to the legal questions involved in such investigations." Section 3 makes the Attorney General *ex officio* a member of the committee, to whom is given the supervision of all actions or proceedings directed by said committee to be brought in behalf of the state or in which the state shall intervene under the provisions of the act, and he shall be assisted by the counsel employed by the committee. Section 4 confers upon the committee such power as will enable it to accomplish its contemplated work. By section 5 the committee is required to make a report of its acts to the governor and a similar report to the next general assembly. Section 6 makes an appropriation of $50,-000, "which said fund shall be subject to the use and disposal of said committee, and the auditor of state shall draw warrants therefor upon vouchers approved by said committee and signed by the chairman and secretary thereof."

Some questions of minor importance, such as the sufficiency of the alternative writ under the previous decision of this court, are argued; but, in view of our conclusion as to the soundness of the act, they will not be considered.

As preliminary to the main discussion, we note the point made by plaintiff that the state auditor may not question the constitutionality of this act in a mandamus action. It is familiar learning that a person may not attack a statute on the ground of its unconstitutionality, whose right it does not affect, and who, therefore, has no

interest in defeating it; but this court has said, in accordance with the weight of authority, that where a statute prescribes a duty to be directly performed by a ministerial or executive officer, as a disbursing officer of the treasury, or an auditor charged with the duty of issuing warrants payable out of public revenues, he may raise the constitutional objection when an action is brought against him to compel his obedience to it. *Newman v. People*, 23 Colo. 300-311, 47 Pac. 278. See, also, a well-considered case. *State v. Candland et al.*, 36 Utah, 406, 104 Pac. 285, 24 L. R. A. (N. S.) 1260, 140 Am. St. Rep. 834.

There are two principal questions for decision: First, may the general assembly, out of the public revenues, appropriate money for the purpose of protecting or defending its rights, or those of its citizens, in the waters of the natural streams of the state: and, second, can the appropriation in this act be upheld, or is it in contravention of our constitution, as an attempt by the general assembly to confer purely executive power on a body or committee composed entirely of its own members? That the general assembly, which, under our constitution, is the representative of the people in making laws, has the power, and is charged with the duty, to protect the state's interest in the natural streams of this state, cannot be questioned. The general purpose which the general assembly had in mind in passing this act is not only praiseworthy, but strictly within the range of legislative action. From the very beginning of settlement in Colorado territory, and in other arid regions of the West, irrigation has been recognized by federal and state legislation, by the decisions of the federal and state courts, and by the people directly interested, as the declared public policy. These decisions need not be cited. They are abundant. In section 5 of article 16 of our state constitution as originally adopted, this public policy is thus tersely expressed: "The water of every natural stream, not here-

tofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." Other sections of the same article make such provision. This language is both emphatic and clear. It is the voice of the people who ratified the constitution, and declares for all time the public policy of this state which theretofore had been recognized by all the departments of the dual governments. The statutes which were enacted by the earlier sessions of our general assembly to carry out the provisions of this section provide an elaborate and systematic scheme for the distribution of the waters of the state to those entitled to their use. The state has.never relinquished its right of ownership and claim to the waters of our natural streams, though it has granted to its citizens, upon prescribed conditions, the right to the use of such waters for beneficial purposes and within its own boundaries. The property right, however, in the natural streams, and the waters flowing therein, has never been renounced or relinquished by the state, and it has at all times asserted not only its right of ownership, but the unrestrained right, within its own boundaries, to distribute its waters to those who have, under its authority, acquired, by perfected appropriations, the right to their use.

This constitution of ours was ratified and adopted by the legal voters of the state in accordance with the conditions prescribed by the enabling act of congress, and the president of the United States in his proclamation admitting Colorado into the Union found the fact to be that the fundamental conditions imposed by congress on the State of Colorado to entitle it to such admission had been complied with. Congress, in passing the enabling act, and the President, in issuing his proclamation, were aware of the existing physical conditions and of the topography

and geography of the state. The federal government, by its lawmaking and executive bodies, knew that the natural streams of this state are, in fact, nonnavigable within its territorial limits, and practically all of them have their sources within its own boundaries, and that no stream of any importance whose source is without those boundaries, flows into or through this state. The entire volume of these streams is therefore made up of rains and snows that fall upon the surface of lands included within the exterior lines of this state and of springs which issue from the earth within the same area. Such being the peculiar conditions, the state was justified in asserting its ownership of all the natural streams within its boundaries. When Colorado was admitted into the Union with such a constitution, the federal government, through its lawmaking and executive departments, thereby recognized and confirmed such right of ownership as belonging to the state in its sovereign capacity. We therefore find it to be not only that our state constitution and pertinent statutes, but the decisions of the courts and duly announced public policy, all are in accord on the proposition to which the federal government has, as we have just shown, given its consent that the waters of the natural streams of this state belong to the people, to the state, in its sovereign capacity, and that its right to their distribution and control within its borders is free from any interference by any other sovereignty.

There is nothing in *Lamson v. Vailes,* 27 Colo. 201, 61 Pac. 231, at all inconsistent with this conclusion. In that case this court declined to pass on the question which is involved in the pending action, because it was not necessary to the decision of that controversy. This court, by then withholding expression of opinion, did not intend to intimate, and did not intimate, that this state did not have full control over its natural streams and the distribution of their waters. The right of congress to regulate and

control navigable interstate streams and the jurisdiction of the Supreme Court of the United States to determine, in a controversy between two or more sovereign states over the waters of an interstate stream, whether they are reasonably exercising their inherent powers of sovereignty, are not overlooked or questioned by us; but these considerations do not, for the reasons above stated, affect or bear upon the right of ownership and control by Colorado of its own natural streams, and its power and authority to regulate the distribution of their waters, within its own territory, for beneficial purposes. We find nothing in *United States v. Rio Grande Irrigation Co.*, 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136, *Kansas v. Colorado*, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, *Rickey L. & C. Co. v. Miller & Lux*, 218 U. S. 258, 31 Sup. Ct. 11, 54 L. Ed. 1032, *Bean v. Morris*, 221 U. S. 485, 31 Sup. Ct. 703, 55 L. Ed. 821, or in any other case that has been brought to our attention, which militates against our conclusion, when these cases are considered, as they should be, in connection with the facts on which they were determined. We therefore conclude that the general assembly, in order to protect the rights of the state in our natural streams and their waters, and the interests which its citizens have acquired thereunder, may make a valid appropriation of money for the purpose of protecting and defending them.

This decision, however, is not conclusive as to the validity of the appropriation made by the act under consideration. It will be observed that there is no pretense by the general assembly that the investigation which it authorizes, and the ascertainment of facts which it proposes, are to aid it in future legislation, or to assist it in its legislative capacity in supplying a remedy for some existing evil, or to furnish such information as a guide to the attorney general, or some other appropriate officer of the executive department, in the performance of his

duties in carrying out the legislative mandate. There can be no question that it is competent for the general assembly to authorize such an investigation to be made by its own members for such purposes and to appropriate money to defray the necessary expenses thereof. But that is not the case we are considering. The general assembly, it is true, purported to make an appropriation; but that appropriation is for the purpose of conducting an investigation by a committee of its own members, so that the committee itself might reach a conclusion as to what it should deem proper to take to protect existing property rights of the state. In other words, the general assembly not only passed an act—that is, made a law—but it made a joint committee of the senate and the house as its executive agent to carry out that law. This is a clear and conspicuous instance of an attempt by the general assembly to confer executive power upon a collection of its own members. This is contrary to article 3 of our constitution, which reads: "The powers of the government of this state are divided into three distinct departments— the legislative, executive and judicial—and no person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others except as in this constitution expressly directed or permitted." It is, of course, in the affairs of government, not always easy to distinguish between executive, legislative, and judicial power, and it sometimes happens that power properly belonging to one department is exercised by another department, but properly, and only, as an incident to its own legitimate functions. The attempt here, however, undisguised, is to confer purely executive power upon a collection of members of the legislative department.

Counsel have cited us to several previous acts of our general assembly, which they claim to be similar to, and

precedents for, the present one. It will be found, in every case, that the duty of carrying out the act was imposed on the attorney general, or some other officer of the executive department, and the appropriation was made to defray the expenses of such executive officers in executing the same. The general assembly might well have authorized the attorney general to expend this money in protecting the rights of the state here involved, and, if it had done so, and the act in other respects had been within the constitutional limit, no question could have been successfully raised as to its validity.

The legislative committee was without power to control this appropriation, and the auditor of the state was right in refusing to recognize its claim to the possession thereof.

The district court took the same view, and its judgment is therefore affirmed. All the Judges concurring.