STATE OF NORTH CAROLINA, ex rel. JAMES C. WALLACE and DAVID
HOWELLS v. ROGER W. BONE and ROBIE L. NASH

FREDERICK S. BARKALOW and BRENDA ARMSTRONG v. J. J. HARRING-
TON, R. P. THOMAS, ROGER W. BONE and ROBIE NASH

No. 55

(Filed 12 January 1982)

**Constitutional Law § 5— separation of powers—legislators on Environmental Man-
agement Commission—legislative act unconstitutional**

G.S. 143B-283(d), increasing the membership of the Environmental
Management Commission by providing two members of the N.C. House of `
Representatives, appointed by the Speaker of the House, and two members of
the N.C. Senate, appointed by the President of the Senate, shall be members
of the EMC, is unconstitutional as it violates the Separation of Powers Clause
of the North Carolina Constitution. The principle of separation of powers is a
cornerstone of our state and federal governments which can be discerned from
early N.C. cases, all three versions of the N.C. Constitution, records with
respect to the drafting and adoption of our first N.C. Constitution and of the
federal constitution, and from the failure of various constitutional amend-
ments. Decisions of sister states also demonstrate an adherence to the separa-
tion of powers principle. Therefore, as the duties of the EMC, G.S. 143B-282 *et
seq.*, are administrative or executive in character and have no relation to the
function of the legislative branch of government, which is to make laws, the
legislature cannot constitutionally, under Section 6 of Article I of the N.C.
Constitution, create a special instrumentality of government to implement
specific legislation and then retain some control over the process of implemen-
tation by appointing legislators to the governing body of the instrumentality.
Section 1, Articles II, III and IV of the N.C. Constitution.

APPEAL by plaintiffs from *Bailey, J.*, 18 March 1981 Session,
WAKE Superior Court.

On 18 February 1981, pursuant to leave granted by the At-
torney General, plaintiffs Wallace and Howells instituted an ac-
tion in the nature of *quo warranto* against defendants Bone and
Nash, members of the North Carolina House of Representatives,
challenging the legality of their serving as members of the North
Carolina Environmental Management Commission (EMC). On the
same day, plaintiffs Barkalow and Armstrong instituted an action
against defendants Bone and Nash, and also defendants Harring-
ton and Thomas, the latter two being members of the North Caro-

lina Senate, challenging the legality of defendants serving on the EMC.

The gist of the complaints is that the service of defendants on the EMC at the same time they are serving as members of the General Assembly violates the Separation of Powers clause of the North Carolina Constitution. Plaintiffs allege that Section 6 of Chapter 1158 of the 1979 Session Laws (Second Session) [codified as G.S. 143B-283(d)] is unconstitutional. This section increases the membership of the EMC by four and provides that two of the additional members shall be members of the House of Representatives appointed by the Speaker of the House, and that the other two shall be members of the Senate appointed by the President of the Senate.

Defendants filed answers in which they admitted most of the allegations of the complaints. However, they denied that the act of the General Assembly complained of is unconstitutional and that their service on the EMC is invalid. They asked that the act be declared constitutional.

By consent of the parties, the actions were consolidated for trial and disposition. On 13 March 1981 the parties agreed to a pre-trial order which contains the following undisputed facts:

   a. James C. Wallace is a citizen, resident, and taxpayer of Orange County, North Carolina.

   b. David H. Howells is a citizen, resident and taxpayer of Wake County, North Carolina.

   c. Frederick S. Barkalow is a citizen and resident of Wake County, North Carolina.

   d. Brenda Armstrong is a citizen and resident of Durham County, North Carolina.

   e. Wallace, Howells, Barkalow, and Armstrong are members of the Environmental Management Commission appointed by the Governor, pursuant to G.S. 143B-283(a).

   f. Roger W. Bone is a citizen and resident of Nash County, North Carolina, and is an elected member of the North Carolina House of Representatives. He is Vice Chairman of the House Committee on Water and Air Resources.

g. Robie Nash is a citizen and resident of Rowan County, North Carolina, and is an elected member of the North Carolina House of Representatives. He serves on both the Water and Air Resources and Energy Committees of the House.

h. J. J. Harrington is a citizen and resident of Bertie County, North Carolina, and is an elected member of the North Carolina Senate. He serves on the Senate Agriculture, Manufacturing, and Public Utilities and Energy Committees.

i. R. P. Thomas is a citizen and resident of Henderson County, North Carolina, and is an elected member of the North Carolina Senate. He serves on both the Senate Local Government & Regional Affairs and Manufacturing Committees.

j. Senators Harrington and Thomas are members of the Environmental Management Commission appointed by the Lieutenant Governor, pursuant to G.S. 143B-283(d)(2).

k. Representatives Bone and Nash are members of the Environmental Management Commission appointed by the Speaker of the House on February 11, 1981, and inducted into office on February 12, 1981, pursuant to G.S. 143B-283(d)(1).

l. The Environmental Management Commission is a quasi-independent regulatory agency of the State with quasi-legislative and quasi-judicial powers and duties as enumerated in G.S. 143B-282.

m. Members of the Environmental Management Commission are public officers.

n. The provision pursuant to which Senators Harrington and Thomas and Representatives Bone and Nash were appointed [G.S. 143B-283(d)] was enacted by the General Assembly in June 1980 as Section 6 of Chapter 1158 of the 1979 Session Laws (2nd Session 1980).

o. Prior to the enactment of G.S. 143B-243(d), the Environmental Management Commission consisted of thirteen (13) members appointed by the Governor. After the enactment of G.S. 143B-243(d), the Environmental Management Commission consists of seventeen (17) members of which thir-

teen (13) are appointed by the Governor, two (2) are appointed by the Speaker of the House from the membership of the House, and two (2) are appointed by the President of the Senate (Lieutenant Governor) from the membership of the Senate.

In the pre-trial order the parties also agreed that the contested issue to be determined by the court is

Whether the provisions of G.S. 143B-243(d) [1979 S.L., Ch. 1158, § 6 (2nd Session, 1981)], by which two representatives and two senators were appointed to membership on the Environmental Management Commission, violate the separation of powers provision of the Constitution of North Carolina (N.C. Const., Art. I, § 6).

Following a hearing at which Judge Bailey considered the pleadings, the stipulations, briefs filed by all parties, and arguments of counsel, he entered a judgment in which he found facts substantially as stipulated by the parties. He concluded as a matter of law, *inter alia*, the following:

5. The legislative members of the Environmental Management Commission (defendants) are in a clear minority position on the Commission. The statutory composition of the Commission does not represent an attempt by the General Assembly to usurp the functions of the executive branch of State government, but represents a cooperative effort between the executive and legislative branches. This court wishes to make it clear that the clear minority position of the legislators on the Commission is a critical factor in the court's decision.

6. Under the circumstances presented in this case, individual members of the legislature may serve on the Environmental Management Commission, without violating the separation of powers provision in Article I, § 6 of the Constitution of North Carolina, where such service falls in the realm of cooperation on the part of the legislature and there is no evidence of an attempt to usurp functions of the executive branch of our State government.

Judge Bailey also concluded that the challenged statute is constitutional. He further concluded that plaintiffs are not entitled to the relief sought and dismissed the actions.

Plaintiffs appealed and defendants petitioned this court for discretionary review prior to determination in the Court of Appeals. Defendants contended that the appeal has significant public interest and that the legal principle involved in these cases is of major significance to the jurisprudence of the state. Plaintiffs joined in the request that we bypass the Court of Appeals. This court allowed the petition on 2 June 1981.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Thomas F. Moffitt, for defendant-appellees.*

*Thomas S. Erwin for plaintiff-appellants.*

BRITT, Justice.

Section 6 of Article I of our state constitution provides: "*Separation of powers.* The legislative, executive and supreme judicial powers of the State government shall be forever separate and distinct from each other." We hold that the challenged enactment of the General Assembly violates this section of the state constitution and that the judgment appealed from must be reversed.

In arriving at this conclusion, we have considered, among other things, the history of the principle of separation of powers in our state and nation, the decisions of other jurisdictions in our nation respecting the principle, and the specific provisions of our constitution and the statutes involved.

I.

Since North Carolina became a state in 1776, three constitutions have been adopted: In 1776, in 1868 and in 1970. The first two documents provided that "[t]he legislative, executive and supreme judicial powers of Government, ought to be forever separate and distinct from each other." The 1970 rewrite contains the language first quoted above, changing "ought to be" to "shall be". Thus each of our constitutions has explicitly embraced the doctrine of separation of powers.[1]

Section 1 of Article II of our present constitution provides that "[t]he legislative power of the State shall be vested in the

---

1. N.C. Constitution, Sec. 4, Declaration of Rights (1776); N.C. Constitution, Art. I, Sec. 8 (1868); N.C. Constitution, Art. I, Sec. 6 (1970).

General Assembly, which shall consist of a Senate and a House of Representatives." Section 1 of Article III provides that "[t]he executive power of the State shall be vested in the Governor." Section 1 of Article IV provides:

> The judicial power of the State shall, except as provided in Section 3 of this Article, be vested in a Court for the Trial of Impeachments and in a General Court of Justice. The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government, nor shall it establish or authorize any courts other than as permitted by this Article.

Previous constitutions contained similar provisions.

Our first state constitution was adopted on 18 December 1776.[2] While records with respect to the drafting and adoption of our first constitution are sparse, history has recorded the instructions given by their constituents to two county delegations participating in the drafting of the first constitution — the delegations from Mecklenburg and Orange Counties. Instructions to the Mecklenburg delegation included the following:

*    *    *

> 4. That you shall endeavor that the form of Government shall set forth a bill of rights containing the rights of the people and of individuals which shall never be infringed in any future time by the law-making power or other derived powers in the State.

> 5. That you shall endeavour that the following maxims be substantially acknowledged in the Bills of Rights (viz):

> 1st. Political power is of two kinds, one principal and superior, the other derived and inferior.

---

2. This constitution was adopted at the Fifth Provincial Congress which met in Halifax, N.C. The constitution was not submitted to a vote of the people. *The History of a Southern State, North Carolina,* Lefler and Newsome, 3rd ed., pg. 221. In commenting on the first constitution, Professors Lefler and Newsome record: "The political theory of the new constitution, stated in Articles 1, 2 and 4, emphasized popular sovereignty, separation of powers, and three separate branches of government." *Id.*

State ex rel. Wallace v. Bone and Barkalow v. Harrington

2nd. The principal supreme power is possessed by the people at large, the derived and inferior power by the servants which they employ.

6. That you shall endeavor that the Government shall be so formed that the derived inferior power shall be divided into three branches distinct from each other, viz:

The power of making laws
The power of executing laws and
The power of Judging.

\*    \*    \*

9. The law making power shall be restrained in all future time from making any alteration in the form of Government.[3]

Instructions to the Orange delegation included the following:

\*    \*    \*

Fourthly. We require that in framing the civil constitution the derived inferior power shall be divided into three branches, to wit: The power of making laws, the power of executing and the power of judging.

Fifthly. That the power of making laws shall have authority to provide remedies for any evils which may arise in the community, subject to the limitations and restraints provided by the principal supreme power.

\*    \*    \*

Seventhly. That the executive power shall have authority to apply the remedies provided by the law makers in that manner only which the laws shall direct, and shall be entirely distinct from the power of making laws.

Eighthly: That the judging power shall be entirely distinct from and independent of the law making and executive powers.

Ninthly: *That no person shall be capable of acting in the exercise of any more than one of these branches at the same*

---

3. *The Colonial Records of North Carolina*, Saunders, Vol. X, 870a, 870b.

*time lest they should fail of being the proper checks on each other and by their united influence become dangerous to any individual who might oppose the ambitious designs of the persons who might be employed in such power.*[4] (Emphasis added.)

The federal constitution was drafted and adopted in 1787, eleven years after our first state constitution was adopted. While the federal constitution contains no explicit provision regarding separation of powers, the principle is clearly implied. Article I, Section 1, provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a senate and house of representatives." Article II, Section 1, provides that "[t]he executive power shall be vested in a president of the United States of America . . . ." Article III, Section 1, provides that "[t]he judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish . . . ."

There is abundant evidence that the drafters of the federal constitution had the separation of powers principle in mind, and, for the most part, the principle has been championed and adhered to throughout the history of our republic.

Alexander Hamilton, one of the drafters of the federal constitution and keeper of copious notes, wrote:

In a single republic, all the power surrendered by the people, is submitted to the administration of a single government; and the usurpations are guarded against, by a division of the government into *distinct and separate* departments. In the compound republic of America, the power surrendered by the people, is first divided between two distinct governments, and then the portion allotted to each subdivided among *distinct and separate* departments. (Emphasis added.) *The Federalist*, No. 51.

4. Id., 870g, 870h. Professors Lefler and Newsome tell us that "it was only the pressure from a few county delegations notably Orange and Mecklenburg, that compelled the Congress to add a Bill of Rights to its constitution." *The History of a Southern State, North Carolina, supra*, pg. 221.

It appears that George Washington, the father of our country, feared the destruction of our form of government by an abuse of the principle of separation of powers. In his Farewell Address, he said:

> It is important, likewise, that the habit of thinking in a free country should inspire caution, in those intrusted with its administration, to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of the love of power, and proneness to abuse it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position.[5]

There are many indications that North Carolina, for more than 200 years, has strictly adhered to the principle of separation of powers. One indication is that ours is one of the few states, if not the only state, in the Union that does not provide its governor with the power to veto enactments of the legislature. Numerous efforts to change our constitution to give the governor that power have failed. The clear implication is that our people do not want the chief executive to have any direct control over our legislative branch.

Another indication is the absence of cases which have come to this court contending that a branch of our state government violated the separation of powers principle. While the case at hand appears to be one of first impression in our jurisdiction, we have found two instances in which members of the judiciary have expressed themselves on the principle.

In the fifth case reported in our reports, *Bayard v. Singleton*, 1 N.C. 5 (1787), it is recorded that Ashe, J., deviated from the case under consideration to make "a few observations on our Constitution and system of government." Obviously referring to our national government, he said:

---

5. Quoted by the Supreme Court of Indiana in *Book v. State Office Building Commission*, 238 Ind. 120, 149 N.E. 2d 273 (1958).

> [A]t the time of our separation from Great Britain, we were thrown into a similar situation with a set of people shipwrecked and cast on a marooned island — without laws, without magistrates, without government or any legal authority — that being thus circumstanced, the people of this country, with a general union of sentiment, by their delegates, met in Congress, and formed that system of those fundamental principles comprised in the Constitution, dividing the powers of government into separate and distinct branches, to wit: The legislative, the judicial, and executive, and assigning to each several and distinct powers, and prescribing their several limits and boundaries; . . . .

1 N.C. at 6.

In *State v. Bell*, 184 N.C. 701, 115 S.E. 190 (1922), this court was confronted with the interpretation and application of a criminal statute relating to support of children. A majority of the court gave the statute a liberal interpretation and upheld the conviction of the defendant. Stacy, J., (later C.J.), dissented on the ground that the statute should be strictly construed. The following is from his dissenting opinion:

> We must hew to the line and let the chips fall wherever they may. And though we may think the law ought to be otherwise, this should not blind our judgment to what it really is. The duty of legislation rests with another department of the Government. It is ours only to declare the law, not to make it. *Moore v. Jones*, 76 N.C. 187. The people of North Carolina have ordained in their Constitution (Art. I, sec. 8) that the legislative, executive, and supreme judicial powers of the Government should be and ought to remain forever separate and distinct from each other. Such is their expressed will, and from the earliest period in our history they have endeavored with sedulous care to guard this great principle of the separation of the powers. In this country, those who make the laws determine their expediency and wisdom, but they do not administer them. The chief magistrate who executes them is not allowed to judge them. To another tribunal is given the authority to pass upon their validity and constitutionality, "to the end that it be a government of laws and not of men." From this unique political division results

our elaborate system of checks and balances—a complication and refinement which repudiates all hereditary tendencies and makes the law supreme. In short, it is one of the distinct American contributions to the science of government; . . . .

184 N.C. at 719.

There should be no doubt that the principle of separation of powers is a cornerstone of our state and federal governments.

## II.

Numerous decisions from sister states show strict adherence to the separation of powers principle and do not tolerate legislative encroachment or control over the function and power of the executive branch. *See Book v. State Office Building Commission, supra; State ex rel State Building Commission of West Virginia v. Bailey,* 151 W. Va. 79, 150 S.E. 2d 449 (1966); *Greer v. Georgia,* 233 Ga. 667, 212 S.E. 2d 836 (1975); *Stockman v. Leddy,* 55 Colo. 24, 129 P. 220 (1912). *See also Bradner v. Hammond,* 553 P. 2d 1 (Alaska 1976); *Ahearn v. Bailey,* 104 Ariz. 250, 451 P. 2d 30 (1969); *In re Advisory Opinion to the Governor,* 276 So. 2d 25 (Fla. 1973); *In re Opinion of the Justices to the Governor,* 369 Mass. 990, 341 N.E. 2d 254 (1976) (This case stated flexibility in allocation of functions may sometimes be permissible, but only if it creates no interference by one department with the power of another.); *Dearborn TP. v. Dail,* 334 Mich. 673, 55 N.W. 2d 201 (1952); and *State ex rel Warren v. Nusbaum,* 59 Wis. 2d 391, 208 N.W. 2d 780 (1973).

A review of a representative number of those decisions is in order.

In *Book v. State Office Building Commission, supra,* the Supreme Court of Indiana declared unconstitutional that part of the State Office Building Act which provided that certain members of the legislature should be members of the State Office Building Commission. The court held that this part of the act violated the division of powers provision of the state constitution because it attempted to confer executive-administrative duties upon members of the legislature. Referring to the separation of powers provision of the Indiana Constitution, the court said:

Article 3, § 1, supra, is not a law against dual office holding. It is not necessary to constitute a violation of the Article, that a person should hold an office in two departments of Government. It is sufficient if he is an officer in one department and at the same time is performing functions belonging to another. *State ex rel. Black v. Burch*, supra, 1948, 226 Ind. 445, 462, 80 N.E. 2d 294, 560, 81 N.E. 2d 850; *Monaghan v. School District No. 1, Clackamas County*, Or. 1957, 315 P. 2d 797, 802-804.

149 N.E. 2d at 296.

In *State ex rel. State Building Commission of West Virginia v. Bailey, supra,* the Supreme Court of Appeals of West Virginia declared unconstitutional that portion of a statute which named certain members of the legislature to the State Building Commission on the ground that the statute violated the separation of powers provision of the state constitution. We quote from the opinion:

[I]t is manifest that the powers granted and the duties imposed upon the State Building Commission of West Virginia by the legislative enactment here involved, Chapter 8, Acts of the Legislature, Regular Session, 1966, are executive or administrative and not legislative in character and that the provision of Section 1 of the statute that the president of the senate, the speaker of the house of delegates, the minority leader of the senate and the minority leader of the house of delegates shall be members of the commission is violative of Article V of the Constitution of this State in that it attempts to confer and impose executive or administrative powers and duties upon those members of the Legislature and for that reason is null and void and of no force and effect.

150 S.E. 2d at 456.

In *Greer v. State of Georgia et al., supra,* the Supreme Court of Georgia declared unconstitutional legislation naming certain legislators to serve on the governing body of the World Congress Authority. The legislative act created said agency, a public corporation, to plan, construct, erect, acquire, own, repair, remodel, maintain, add to, extend, improve, equip, operate and manage the Georgia World Congress Center. The act also provided that the

governing body of the authority would consist of 20 members, six of whom would be members of the General Assembly. In holding that the part of the act providing for members of the legislature to serve on the authority violated the separation of powers provision of the state constitution, the Georgia court said:

> The question here is whether the legislature can constitutionally create a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality. Appellants' argument is that there is no constitutional defect in this arrangement. Carried to its logical extreme, this arrangement would permit the General Assembly to appoint an ad hoc committee of its own members to implement specific legislation. The case at bar does not present such a logical extreme, but it evidences the same constitutional infirmity. We have to conclude that a legislator who participates as a member of the governing body of a public corporation such as the World Congress Center Authority is performing executive functions.

212 S.E. 2d at 838.

In *Stockman v. Leddy, supra,* the Supreme Court of Colorado declared unconstitutional an act of the Colorado legislature creating a joint committee of its members to conduct an investigation on which the committee would come to a conclusion and act in prosecuting or defending certain actions for the benefit of the state. In holding that the legislation violated the principle of separation of powers, the Colorado court said:

> [T]he General Assembly not only passed an act—that is, made a law—but it made a joint committee of the Senate and the House as its executive agent to carry out that law. This is a clear and conspicuous instance of an attempt by the General Assembly to confer executive power upon a collection of its own members. This is contrary to article 3 of our Constitution, . . . .

129 P. at 223.

In *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), the U.S. Supreme Court, after stating that

our federal constitution distributes the power of government between the three branches, said:

> This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, *Springer v. Philippine Islands*, 277 U.S. 189, 201, 72 L.Ed. 845, 849, 48 S.Ct. 480, namely, to preclude a commingling of these essentially different powers of government in the same hands.

77 L.Ed. at 1360.

In his judgment, Judge Bailey recited that he found the decision of the Supreme Court of South Carolina in *State ex rel. McLeod v. Edwards*, 269 S.C. 75, 236 S.E. 2d 406 (1977), to be very persuasive. He also cited *State ex rel. Schneider v. Bennett*, 219 Kan. 285, 547 P. 2d 786 (1976). A study of these cases reveals that South Carolina and Kansas have deviated from the separation of powers principle.

In *State ex rel. McLeod v. Edwards, supra,* the constitutionality of two members of the South Carolina General Assembly serving as *ex officio* members of the State Budget and Control Board was challenged. This board is composed of the governor, the state treasurer, the controller general, the chairman of the senate finance committee, and the chairman of the house ways and means committee. All members of the board are *ex officio*. Relying on its previous decisions, the court held that the inclusion of members of the legislature on the board did not violate the separation of powers provisions of the state constitution. In defending its holdings, the court said:

> While the foregoing disposes of the present separation of powers issue, we think that an examination of the principle, as applied to the present facts, reveals the basis for the result reached in our prior decisions. Important in this case is the fact that the General Assembly has been careful to put the legislative members in a minority position on The Board. The statutory composition of The Board does not represent an attempt to usurp the functions of the executive department, but apparently represents a cooperative effort by making available to the executive department the special knowledge and expertise of the chairman of the two finance

committees in the fiscal affairs of the State and the legislative process in general. We view the ex officio membership of the legislators on The Board as cooperation with the executive in matters which are related to their function as legislators and not usurpation of the functions of the executive department.

236 S.E. 2d 408-09.

In *State ex rel. Schneider v. Bennett, supra,* the question of the constitutionality of members of the legislature serving on the state finance council was presented. This council consists of the governor, the speaker of the house, the president of the sentate, the majority and minority leaders of the house and senate, and the chairmen of the ways and means committees of the house and senate. The council was created as a "legislatively oriented" agency to approve the rules and regulations of the department of administration and thereby to check the power of the governor to coordinate the activities of state agencies. The council was specifically authorized to exercise control and authority over the state department of administration as a whole; to approve any and all rules and regulations with respect to the manner of performance of *any* power or duty of the department and the execution of any business of the department and its relations to and business with other state agencies; to hear and determine appeals by any state agency from final decisions or final actions of the secretary of administration; and to make allocations to, and approve expenditures by a state agency from any appropriations to the state finance council for that purpose, of funds for unanticipated and unbudgeted needs, under conditions and limitations prescribed by the legislature.

In commenting on the separation of powers doctrine, the Kansas court said:

In our judgment a strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power including legislative, executive, and judicial powers often blended together in the same administrative agency. The courts today have come to recognize that the political philosophers who developed the theory of separation of powers did not have any concept of the complexities of

government as it exists today. Under our system of government the absolute independence of the departments and the complete separation of powers is impracticable. We must maintain in our political system sufficient flexibility to experiment and to seek new methods of improving governmental efficiency. At the same time we must not lose sight of the ever-existing danger of unchecked power and the concentration of power in the hands of a single person or group which the separation of powers doctrine was designed to prevent.

547 P. 2d at 791.

However, the Kansas court also said:

The separation of powers doctrine does not in all cases prevent individual members of the legislature from serving on administrative boards or commissions created by legislative enactments. Individual members of the legislature may serve on administrative boards or commissions where such wervice falls in the realm of cooperation on the part of the legislature and there is no attempt to usurp functions of the executive department of the government. (Citations.)

547 P. 2d at 792.

The Kansas court then proceeded to hold, however, that many, if not most, of the duties assigned to the state finance council were executive in nature and the exercise of those powers by legislators was unconstitutional. We quote again from the opinion:

All of these powers concern the day-to-day operations of the department of administration and its various divisions. The vesting of such powers in the state finance council in our judgment clearly grants to a legislatively oriented body control over the operation of an executive agency and constitutes a usurpation of executive power by the legislative department.

547 P. 2d at 797.

## III.

Having stated the history of the separation of powers principle, and having considered its application by other states, we now

relate the principle to the challenged legislation providing for four members of our General Assembly to serve on the EMC.

The Environmental Management Commission exists pursuant to G.S. 143B-282 *et seq.* Its purpose is stated in G.S. 143B-282 as follows:

There is hereby created the Environmental Management Commission of the Department of Natural Resources and Community Development with the power and duty to promulgate rules and regulations to be followed in the protection, preservation, and enhancement of the water and air resources of the State.

Within the limitations of G.S. 143-215.9 concerning industrial health and safety, the EMC has the power and duty, among other things, to grant and revoke permits with regard to controlling sources of air and water pollution; to issue special orders pursuant to certain statutes to any person whom the commission finds responsible for causing or contributing to any pollution of water within a watershed or pollution of the air within the area for which standards have been established; to conduct and direct that investigations be conducted pursuant to certain statutes; to conduct public hearings, institute actions in superior court, and agree upon or enter into settlements, all pursuant to G.S. 143-215.3; to direct the investigation of any killing of fish and wildlife pursuant to G.S. 143-215.3; to review and have general oversight and supervision over local air pollution control programs pursuant to certain statutes; to declare an emergency when it finds a generalized dangerous condition of water or air pollution pursuant to certain statutes; to grant permits for water use within capacity use areas pursuant to G.S. 143-215.15; to direct that investigations be conducted when necessary to carry out duties regarding capacity use areas; to approve, disapprove and approve subject to conditions all applications for dam construction pursuant to G.S. 143-215.28; to halt dam construction pursuant to G.S. 143-215.29; to have jurisdiction and supervision over the maintenance and operation of dams pursuant to G.S. 143-215.31; and to have jurisdiction and supervision over all pollution pursuant to Article 21A of Chapter 143. G.S. 143B-282(1).

The EMC is also given the power and duty to establish standards and adopt rules and regulations for air quality standards,

emission control standards, and classifications for air contaminant sources pursuant to G.S. 143-215.107; for water quality standards and classifications pursuant to certain statutes, to implement the issuance of permits for water use within capacity use areas; and for the protection of sand dunes pursuant to certain statutes. G.S. 143B-282(2).

Prior to 1979, the EMC consisted of 13 members, all appointed by the Governor. The statute also sets forth certain vocational qualifications for members of the commission.

It is crystal clear to us that the duties of the EMC are administrative or executive in character and have no relation to the function of the legislative branch of government, which is to make laws. We agree with the Georgia court's holding in *Greer*, that the legislature cannot constitutionally create a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality.

We agree with the Kansas and South Carolina courts that there should be cooperation between the legislative and executive branches of government. For many years North Carolina has recognized and benefited from cooperative efforts between the branches of its government. The best examples of this are various study commissions on which legislators and non-legislators, including persons from other branches of government, have served. Many recommendations of these commissions have been enacted into law beneficial to the citizens of our state.

Counsel for defendants have set forth in an exhibit to their brief a list of 49 other boards and commissions on which legislators serve as members pursuant to statutes. We do not find it appropriate to comment on any board or commission except the one which is the subject of this appeal. Suffice it to say, the people of North Carolina on at least three occasions—the last opportunity being as late as 1970—explicitly adopted the principle of separation of powers. It behooves each branch of our government to respect and abide by that principle.

For the reasons stated, we conclude that Section 6 of Chapter 1158 of the 1979 Sessions Laws [codified at §§ (d) of G.S.

143B-283] violates Section 6 of Article I of the North Carolina Constitution. Consequently, the judgment appealed from is

Reversed.