IN THE SUPREME COURT OF NORTH CAROLINA

No. 409PA17

Filed 21 December 2018

ROY A. COOPER, III, in his official capacity as Governor of the State of North
Carolina

v.

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North
Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of
the North Carolina House of Representatives


On discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal of right

of a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1) of a

unanimous, per curiam decision of the Court of Appeals, ___ N.C. App. ___, 807 S.E.2d

176 (2017), affirming an order of summary judgment entered on 17 March 2017 in

Superior Court, Wake County, by a three-judge panel under N.C.G.S. § 1-267.1.

Heard in the Supreme Court on 2 October 2018.


> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Daniel F.E. Smith,*
> *Jim W. Phillips, Jr., and Eric M. David, for plaintiff-appellant.*
>
> *Nelson Mullins Riley & Scarborough LLP, by D. Martin Warf, Noah H.*
> *Huffstetler, III, and Candace Friel, for defendant-appellees.*


MARTIN, Chief Justice.

The Governor is our state's chief executive.  He or she bears the ultimate

responsibility of ensuring that our laws are properly enforced.  *See State ex rel.*

*McCrory v. Berger*, 368 N.C. 633, 635, 781 S.E.2d 248, 250 (2016).  Indeed, the

Constitution of North Carolina enshrines this executive duty: "The Governor shall take care that the laws be faithfully executed." N.C. Const. art. III, § 5(4).

But the Governor is not alone in this task. Our state constitution establishes nine other offices in the executive branch. *See id.* art. III, §§ 2, 7. These offices are elected and consist of the Lieutenant Governor, Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of Agriculture, Commissioner of Labor, and Commissioner of Insurance. *Id.* Collectively, these ten offices are known as the Council of State. *See id.* art. III, § 8.[1]

To further assist the executive branch in fulfilling its purpose, our constitution requires the General Assembly to "prescribe the functions, powers, and duties of the administrative departments and agencies of the State." *Id.* art. III, § 5(10). The heads of the administrative departments that are not headed by members of the

---

[1] The historical roots of the Council of State can be traced to the advisory councils of the English monarchs. The Research Branch, Div. of Archives & History, N.C. Dept. of Cultural Res., *The Council of State in North Carolina: An Historical Research Report* 8 (1986). In North Carolina, the use of an executive council predates our earliest constitution. *See generally id.* at 8-127 (discussing the development of the Council of State before the American Revolution). At the founding, the Council of State consisted of seven persons appointed by the General Assembly to advise the Governor. N.C. Const. of 1776, § XVI. With the passage of the Constitution of 1868, "the Council of State became a body of directly elected officers, with executive duties of their own." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 124-25 (2d ed. 2013); *see also* N.C. Const. of 1868, art. III, § 14 ("The Secretary of State, Auditor, Treasurer, Superintendent of Public Works, and Superintendent of Public Instruction, shall constitute, *ex officio*, the Council of State . . . . The Attorney General shall be, *ex officio*, the legal adviser of the Executive Department."). The most recent iteration of the Council of State—consisting of the ten elected Article III officers that we have just listed—has remained unchanged since our current constitution was ratified. *See* N.C. Const. art III, §§ 7-8.

Council of State are appointed to their posts rather than being elected by the people. *See* N.C.G.S. § 143B-9(a) (2017). These appointed officers make up the membership of the Governor's Cabinet. *See, e.g., id.* § 126-6.3 (2017 & Supp. 2018) (referring to the administrative departments created by Chapter 143B of the North Carolina General Statutes as "Cabinet agencies"); *id.* § 143-745(a)(1) (2017) (defining "Agency head" as "the Governor, a Council of State member, *a cabinet secretary*, . . . and other independent appointed officers with authority over a State agency" (emphasis added)). "[T]o perform his constitutional duty," the Governor must have "enough control" over the members of his Cabinet to take care that the laws be faithfully executed. *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256.

In this case, plaintiff Roy A. Cooper, III, the Governor of North Carolina, challenges the appointments provision of N.C.G.S. § 143B-9(a), which grants the North Carolina Senate the power to confirm the people that he nominates to serve in his Cabinet. Plaintiff alleges that senatorial confirmation undermines his control over the views and priorities of those who serve in his administration and violates the separation of powers that our constitution guarantees. *See* N.C. Const. art. I, § 6.

We hold that senatorial confirmation of the members of the Governor's Cabinet does not violate the separation of powers clause when, as is the case here, the Governor retains the power to nominate them, has strong supervisory authority over them, and has the power to remove them at will. The Governor's power to nominate is significant, and the ultimate appointee will be a person that he alone has chosen,

subject only to an up-or-down vote by the Senate. The Governor's supervisory and removal powers, moreover, ensure that the Governor retains ample post-appointment control over how his Cabinet members perform their duties. As a result, subsection 143B-9(a)'s senatorial confirmation requirement leaves the Governor with enough control to take care that the laws be faithfully executed, and therefore does not violate the separation of powers clause.

I

N.C.G.S. § 143A-11 creates ten principal administrative departments headed by the members of the Council of State—sometimes called the "Council of State agencies." *See, e.g.*, N.C.G.S. § 126-6.3; *see also* N.C. Const. art. III, §§ 2, 7, 8. Supplementing these departments are eleven additional principal administrative departments named in N.C.G.S. § 143B-6—the Community Colleges System Office and the Departments of Natural and Cultural Resources, Health and Human Services, Revenue, Public Safety, Environmental Quality, Transportation, Administration, Commerce, Information Technology, and Military and Veterans Affairs. These eleven departments are sometimes called "Cabinet agencies." *See, e.g., id.* § 126-6.3. The constitution does not directly mention any of these departments; they are statutory creations.

The heads of these departments—i.e., the members of the Governor's Cabinet—are statutory officers; they hold offices created by statute. *See, e.g., id.*

§ 143B-52 (2017) (naming the Secretary of Natural and Cultural Resources as the head of the corresponding department); *id.* § 143B-139 (2017) (doing likewise for the Secretary of Health and Human Services). These officers are appointed according to a process defined by statute. That statute currently grants the Governor the power to "appoint[ ]" individuals to fill each Cabinet position, "subject to senatorial advice and consent in conformance with Section 5(8) of Article III of the North Carolina Constitution [i.e., the constitution's appointments clause]." *Id.* § 143B-9(a); *see also* N.C. Const. art. III, § 5(8) ("The Governor shall nominate and by and with the advice and consent of a majority of the Senators appoint all officers whose appointments are not otherwise provided for.").

Other provisions of Chapter 143B address the Governor's ability to supervise and remove Cabinet members. N.C.G.S. § 143B-4 reiterates the Governor's role as "the Chief Executive Officer of the State." *See also* N.C. Const. art III, § 1 (vesting the executive power of the State in the Governor). That same statute gives the Governor final authority to "formulat[e] and administer[ ] the policies of the executive branch." N.C.G.S. § 143B-4 (2017). In addition, Cabinet members must provide the Governor with extensive information about the work of their respective departments. For example, Cabinet members must "submit to the Governor an annual plan of work" and "an annual report covering programs and activities for each fiscal year." *Id.* § 143B-10(h) (2017). Cabinet members must also "develop and report to the Governor legislative, budgetary, and administrative programs to accomplish" long-

term policy goals. *Id.* § 143B-10(i) (2017). If the Governor wishes to remove any of the members of his Cabinet, he or she may do so at any time, for any reason. *See id.* § 143B-9(a).

Plaintiff alleges that the appointments process for Cabinet members set forth in N.C.G.S. § 143B-9(a) is unconstitutional. On 30 December 2016, plaintiff filed a complaint in Superior Court, Wake County, challenging the constitutionality of another act of the General Assembly.[2] On 10 January 2017, plaintiff amended his complaint to allege that a separate act requiring senatorial confirmation of his Cabinet members violates the appointments clause and the separation of powers clause of our state constitution. *See* N.C. Const. art. I, § 6 (separation of powers clause); *id.* art. III, § 5(8) (appointments clause). Plaintiff sought a declaration that this aspect of subsection 143B-9(a)'s appointments process is unconstitutional and a permanent injunction barring the operation of section 143B-9 as written.

A divided three-judge panel of the superior court determined that the appointments process in subsection 143B-9(a) does not violate the constitution and granted summary judgment to defendants. Plaintiff appealed this decision to the Court of Appeals. On 7 November 2017, the Court of Appeals issued a per curiam opinion affirming the trial court's decision. *Cooper v. Berger*, ___ N.C. App. ___, ___, 807 S.E.2d 176, 181-82 (2017) (per curiam). Plaintiff then filed a notice of appeal of

---

[2] The legislative act initially challenged is not a subject of this appeal.

a substantial constitutional question pursuant to N.C.G.S. § 7A-30(1) and also petitioned this Court for discretionary review of the same constitutional question pursuant to N.C.G.S. § 7A-31. We retained plaintiff's notice of appeal and allowed plaintiff's petition.

II

North Carolina courts have the power and the duty to determine whether challenged acts of the General Assembly violate the constitution. *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6-7 (1787). This Court interprets the provisions of the Constitution of North Carolina with finality. *E.g., McCrory*, 368 N.C. at 638, 781 S.E.2d at 252; *Hart v. State*, 368 N.C. 122, 130, 774 S.E.2d 281, 287 (2015). We review constitutional questions de novo. *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001).

Plaintiff alleges that the Senate's "authority to approve, or disapprove, the persons selected by the Governor to serve" as Cabinet members pursuant to subsection 143B-9(a) "improperly encroaches upon the Governor's constitutional authority." In his own words, plaintiff's challenge pertains to "the structure created by" subsection 143B-9(a) and to the degree of control that subsection 143B-9(a) allows the Senate to exercise, "not [to] whether the [Senate] actually exerted that control." *Cf. McCrory*, 368 N.C. at 647, 781 S.E.2d at 257 (indicating that, when legislative involvement in the appointment of executive officers is at issue, the separation of

powers clause requires this Court to evaluate how much control the legislation in question "*allows* the General Assembly to exert over the execution of the laws" (emphasis added)). Plaintiff's challenge thus amounts to a facial challenge to the constitutionality of N.C.G.S. § 143B-9(a)—that is, a challenge that subsection 143B-9(a)'s advice-and-consent provision is unconstitutional in all circumstances. *Cf. Hart*, 368 N.C. at 131, 774 S.E.2d at 288 ("[T]he party making [a] facial challenge [must] meet the high bar of showing 'that there are no circumstances under which the statute might be constitutional.' " (quoting *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009))).[3]

When reviewing an act of the General Assembly, we presume that the act is constitutional, and we will declare it invalid only if it violates the constitution beyond a reasonable doubt. *Id.* at 131, 774 S.E.2d at 287-88 (citing *Baker v. Martin*, 330 N.C. 331, 334-35, 410 S.E.2d 887, 889 (1991)). "[A] facial challenge to the constitutionality of an act . . . is the most difficult challenge to mount successfully." *Id.* at 131, 774 S.E.2d at 288. "We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Beaufort Cty. Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at

---

[3] While it is possible to envision a scenario in which the Senate's arbitrary rejection of capable nominees for a particular office might violate the separation of powers clause, "[t]he fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *State v. Bryant*, 359 N.C. 554, 564, 614 S.E.2d 479, 486 (2005) (quoting *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998)).

280. These well-established principles provide the lens through which we view this case.

**A**

The separation of powers clause states that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. This concept is "a cornerstone of our state and federal governments." *State ex rel. Wallace v. Bone*, 304 N.C. 591, 601, 286 S.E.2d 79, 84 (1982). Separating the powers of the government preserves individual liberty by safeguarding against the tyranny that may arise from the accumulation of power in one person or one body. *See* Montesquieu, *The Spirit of the Laws* 151-52 (Thomas Nugent trans., Hafner Press 1949) (asserting that "there can be no liberty" where two or more of these governmental powers "are united in the same person"). "The clearest violation of the separation of powers clause occurs when one branch exercises power that the constitution vests exclusively in another branch." *McCrory*, 368 N.C. at 645, 781 S.E.2d at 256. Whether or not a violation of this kind has occurred is a binary question, not a question of degree; one branch either is, or is not, exercising power vested exclusively in another branch.

In *State ex rel. Wallace v. Bone*, for example, we considered the constitutionality of a law providing for the appointment of four sitting legislators to the North Carolina Environmental Management Commission (EMC). 304 N.C. at

591-92, 606-07, 286 S.E.2d at 79, 87. The General Assembly created the EMC as a commission of one of the Cabinet agencies and tasked it with "promulgat[ing] rules and regulations" aimed at protecting our state's water and air. *Id.* at 607, 286 S.E.2d at 87-88. The EMC's powers included "grant[ing] and revok[ing] permits," investigating regulatory violations, and "issu[ing] special orders pursuant to certain statutes to any person whom the commission finds responsible" for regulatory violations. *Id.* at 607, 286 S.E.2d at 88. This Court found it "crystal clear" that the EMC's functions and duties were "administrative or executive in character." *Id.* at 608, 286 S.E.2d at 88. We held that the General Assembly "cannot constitutionally create a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation *by appointing legislators to the governing body of the instrumentality*." *Id.* (emphasis added). In other words, legislators were wielding executive power, which violated the per se rule prohibiting one branch of government from exercising powers vested exclusively in another branch.

In this case, though, the per se rule from *Wallace* does not apply. As we held in *McCrory*, the appointments clause "authorizes the Governor to appoint all *constitutional* officers whose appointments are not otherwise provided for by the constitution." 368 N.C. at 644, 781 S.E.2d at 255 (emphasis added). The appointments clause therefore does not prohibit the General Assembly from

-10-

appointing, or from confirming the nominations of, *statutory* officers. *See id.*[4] And this Court has long held "that appointing statutory officers is not an exclusively executive prerogative." *See id.* at 648, 781 S.E.2d at 258 (first citing *Cunningham v. Sprinkle*, 124 N.C. 638, 643, 33 S.E. 138, 139 (1899); and then citing *Trs. of Univ. of N.C. v. McIver*, 72 N.C. 76, 85 (1875)). Because the power to appoint statutory officers is not vested exclusively in any branch, the lesser power to *confirm* statutory officers is not vested exclusively in any branch, either. As a result, no branch can, in exercising the power to confirm statutory officers, violate the per se separation of powers rule that *Wallace* established.

Cabinet members are statutory officers. Their existence stems directly from the Executive Organization Act of 1973, codified in Chapter 143B of our General Statutes, not from any provision of the constitution. It follows that the appointments process in subsection 143B-9(a), which governs the appointments of these statutory officers, does not violate the per se *Wallace* rule.

---

[4] Our state constitution's appointment model thus differs from the federal appointment model, in which "[t]he [United States Constitution's] Appointments Clause prescribes the *exclusive* means of appointing 'Officers.'" *Lucia v. SEC*, ___ U.S. ___, ___,138 S. Ct. 2044, 2051 (2018) (emphasis added); *see also McCrory*, 368 N.C. at 640 n.3, 781 S.E.2d at 252 n.3 (quoting *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S. Ct. 612, 688 (1976) (per curiam)) (explaining that the federal appointments clause "deliberately denie[s] Congress" any appointment power over officers, and highlighting how that clause differs from our state constitution's appointments clause). Because of the nature of the federal model, the relevant inquiry under the Federal Constitution is not whether the office is constitutional or statutory, but whether the appointee is an officer or a "non-officer employee[ ]." *See Lucia*, ___ U.S. at ___, 138 S. Ct. at 2051 (stating that, if the appointees in question are non-officer employees, "the Appointments Clause cares not a whit about who named them").

B

Next, we must address whether the challenged process satisfies the functional separation of powers test set forth in *McCrory*—which, unlike *Wallace*'s per se rule, *is* a question of degree. *Cf. McCrory*, 368 N.C. at 646-47, 781 S.E.2d at 257 ("*We cannot adopt a categorical rule* that would resolve every separation of powers challenge to the legislative appointment of executive officers. . . . [W]e must examine *the degree of control* that the challenged legislation allows the General Assembly to exert over the execution of the laws." (emphases added)). When the challenge involves the Governor's constitutional authority, we must ask "whether the actions of a coordinate branch 'unreasonably disrupt a core power of the executive.' " *Id.* at 645, 781 S.E.2d at 256 (quoting *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2001)).

Our constitution gives the Governor the power and the duty to "take care that the laws be faithfully executed." N.C. Const. art. III, § 5(4); *see also McCrory*, 368 N.C. at 645, 649, 781 S.E.2d at 256, 258. While, as we have just discussed, the appointments clause places no per se restrictions on the appointment of statutory officers, the separation of powers clause requires that the Governor have "enough control over" executive officers "to perform his constitutional duty" under the take

care clause. *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256.[5] Because there is no categorical rule that determines whether a statutory framework which involves the General Assembly in the appointment of executive-branch statutory officers affords the Governor enough control over those officers, "we must resolve each challenge by carefully examining its specific factual and legal context." *Id.* at 646-47, 781 S.E.2d at 257.

As we have previously indicated, the degree of control that the Governor has over executive officers can be measured by considering "his ability to appoint [them], to supervise their day-to-day activities, and to remove them from office." *Id.* at 646, 781 S.E.2d at 256. In *McCrory*, we considered the balance between these factors within the statutory frameworks of three administrative commissions. *See id.* at 636, 781 S.E.2d at 250. In each framework, the General Assembly had granted itself the majority of appointments on the commission in question, had insulated the commission from gubernatorial supervision, and had allowed the Governor to remove commissioners only for cause. *Id.* at 646, 781 S.E.2d at 256-57. These frameworks, we noted, "le[ft] the Governor with little control over the views and priorities of the officers that the General Assembly appoints" and enabled "the General Assembly . . . [to] exert most of the control over . . . executive policy . . . in any area of the law that

---

[5] As in *McCrory*, "[o]ur opinion takes no position on how the separation of powers clause applies to those executive departments that are headed by the independently elected members of the Council of State." *Id.* at 646 n.5, 781 S.E.2d at 256 n.5.

the commission[s] regulate[d]." *Id.* at 647, 781 S.E.2d at 257. We therefore found that the provisions challenged there violated the separation of powers clause. *See id.*

Turning to the facts of this case, we first acknowledge that the officers at issue here are not just members of administrative commissions; they are the heads of entire administrative departments. As department heads, Cabinet members have far more discretion, and wield far more executive power, than the commissioners in *McCrory* did. Among other things, they have the authority to reorganize their departments, to create and fill subordinate staff positions, and to establish advisory committees. N.C.G.S. § 143B-10 (2017). In addition, Cabinet members are some of the Governor's closest deputies, and are critical to the Governor's ability to take care that the laws be faithfully executed.

So the authority of these appointees is undoubtedly substantial. But a faithful application of the three-factor test set forth in *McCrory* shows that the Governor retains enough control over them to perform his constitutional duties. In short, senatorial confirmation of Cabinet members does not unconstitutionally impede the Governor's power and duty under the take care clause because the Governor still has the power to nominate them, has strong supervisory authority over them, and has the power to remove them at will.

With respect to the first *McCrory* factor, senatorial confirmation curtails the Governor's appointment power only minimally. As Federalist 76 suggests, the power

to nominate is superior to the power to confirm. "In the act of nomination, [the chief executive's] judgment alone would be exercised . . . ." The Federalist No. 76 (Alexander Hamilton); *see also Myers v. United States*, 272 U.S. 52, 121, 47 S. Ct. 21, 27 (1926) (observing that, in the federal model, the Senate's rejection of a nominee "does not greatly embarrass [the President] in the conscientious discharge of his high duties in the selection of those who are to aid him, because the President usually has an ample field from which to select for office, according to his preference, competent and capable men"). The universe of people from whom the Governor may choose is open—he may nominate any eligible person to serve as a member of his Cabinet. In granting the Senate the power to confirm Cabinet nominees, the General Assembly has undoubtedly granted the Senate some piece of the appointment power. But the Governor retains the most important role in the process: the ability to choose, from the universe of all eligible people, the person on whom the Senate will have an up-or-down vote.

This arrangement starkly contrasts with the statutory frameworks at issue in our recent separation-of-powers-clause decisions. In *McCrory*, we struck down legislation in which the General Assembly had granted itself the unilateral authority to appoint a majority of the commissioners on each of the commissions at issue. 368 N.C. at 637, 781 S.E.2d at 251. And in *Cooper v. Berger*, we rejected a framework in which the Governor had to choose his appointees from two short lists prepared "by the State party chair[s] of the two political parties with the highest number of

registered affiliates," with an equal number of members to be drawn from each list. 370 N.C. 392, 396, 809 S.E.2d 98, 101 (2018). Here, the Governor may select his nominees from a virtually unlimited pool of qualified people.

With respect to the second *McCrory* factor, moreover, the Governor's supervisory powers augment his control over the views and priorities of his Cabinet members. The Governor is ultimately "responsible for formulating and administering the policies of the executive branch of the State government." N.C.G.S. § 143B-4. Each Cabinet member must "submit to the Governor an annual plan of work for the next fiscal year," *id.* § 143B-10(h), and "report to the Governor legislative, budgetary, and administrative programs to accomplish comprehensive, long-range coordinated planning and policy formulation in the work of his department," *id.* § 143B-10(i). And many of the Cabinet members' discretionary decisions regarding department organization and operation require the Governor's approval before taking effect. *See, e.g., id.* § 143B-10(b) (providing that each principal State department head may, "[w]ith the approval of the Governor, . . . establish or abolish . . . any division" within the department head's department); *id.* § 143B-10(j)(2) (providing that each principal State department head "may adopt . . . [r]ules, approved by the Governor, to govern the management of the department, which shall include the functions of planning, organizing, staffing, directing, coordinating, reporting, budgeting, and budget preparation which affect private rights or procedures available to the public"). In short, the Governor has extensive supervisory power, allowing him to directly

manage his Cabinet members in virtually every aspect of their authority.

Finally, with respect to the third *McCrory* factor, members of the Governor's Cabinet "serve at the Governor's pleasure," *id.* § 143B-9(a), meaning that the Governor may remove them for any reason or for no reason at all. If a Cabinet member's performance does not conform to the Governor's wishes, the Governor may remove him or her. If a Cabinet member acts too slowly to implement the Governor's policies, the Governor may remove him or her. If the Governor decides to change directions in a given policy area and the corresponding Cabinet member is not willing to be flexible, the Governor may remove him or her. In other words, the Governor retains plenary authority to remove the members of his Cabinet. With that authority, he may prevent any member of his Cabinet from refusing to properly implement his preferred policies.

In light of the Governor's broad power to supervise and remove his Cabinet members, and in light of the open universe from which the Governor may select his Cabinet nominees, the confirmation power gives the Senate little ability to determine who will be executing the law or how they will do so. Once confirmed, Cabinet members are—to the extent that they are subject to control by another government official—subject to complete control by the Governor. It follows that any effort by the Senate to block one qualified nominee in the hopes that the Governor would then nominate someone who shares the views and priorities of a majority of senators (assuming that the views and priorities of a majority of senators differ from those of

the Governor) would likely be futile. Thus, although the Governor does not have sole appointment power under subsection 143B-9(a), he has immense influence over who serves in his Cabinet and over what his Cabinet members do. More fundamentally, he retains enough control over the members of his Cabinet to take care that the laws be faithfully executed.

Applying these factors to the statutory scheme as a whole, we hold that senatorial confirmation of the Governor's Cabinet nominees does not unconstitutionally impede the Governor's ability to take care that the laws be faithfully executed.

### III

Plaintiff makes four additional arguments to support his contention that senatorial confirmation of Cabinet members is unconstitutional. Although these arguments deal with many of the same concepts as separation-of-powers-clause challenges do, they do not themselves arise out of the separation of powers clause. Instead, they purport to use methods of constitutional construction, or methods of construction that apply to legal texts more broadly, to establish the unconstitutionality of subsection 143B-9(a)'s appointments process.

Each argument revolves, in one way or another, around two constitutional provisions that specify some form of legislative confirmation of gubernatorial appointees. First, plaintiff cites the appointments clause, which requires

constitutional officers whose appointments are not otherwise provided for by the constitution to be nominated by the Governor and confirmed by a majority of the Senate. N.C. Const. art. III, § 5(8); *McCrory*, 368 N.C. at 644, 781 S.E.2d at 255. Second, he cites Article IX, Section 4(1), which states that "eleven members" of the State Board of Education shall be "appointed by the Governor, subject to confirmation by the General Assembly in joint session."[6]

Plaintiff argues, based on these two provisions, that senatorial confirmation of members of the Governor's Cabinet is unconstitutional based on the canon of *expressio unius est exclusio alterius*. Plaintiff essentially claims that, because the constitution twice mentions some form of legislative confirmation for certain constitutional officers but fails to require any form of legislative confirmation for statutory officers, the constitution implicitly prohibits the General Assembly from requiring legislative confirmation of statutory officers.

"Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list." *Evans v. Diaz*, 333 N.C. 774, 779-80, 430 S.E.2d 244, 247 (1993) (citing

---

[6] To the extent that plaintiff asserts in his reply brief that "the power of appointment is an executive power," this premise directly conflicts with our prior decisions. The power of appointment is not inherently executive, *see Cunningham v. Sprinkle*, 124 N.C. 638, 643, 33 S.E. 138, 139 (1899) ("[T]he election of officers is not an executive, legislative or judicial power, but only a mode of filling the offices created by law . . . ."), and therefore is not an "executive power of the State . . . vested in the Governor" by Article III, Section 1 of our state constitution. *See, e.g.*, *McCrory*, 368 N.C. at 648, 781 S.E.2d at 258 (first citing *Cunningham*, 124 N.C. at 643, 33 S.E. at 139; and then citing *McIver*, 72 N.C. 76, 85).

*Alberti v. Manufactured Homes, Inc.*, 329 N.C. 727, 732, 407 S.E.2d 819, 822 (1991)). "The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81, 122 S. Ct. 2045, 2050 (2002). In other words, sometimes a provision is written (or a set of provisions are written) in such a way that a reasonable negative inference can and should be drawn. *See, e.g.*, *Jennings v. Rodriguez*, ___ U.S. ___, ___, 138 S. Ct. 830, 844 (2018). Because the application of the *expressio unius* canon "depends so much on context," however, "it must be applied with great caution." Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012).

Context significantly limits the application of this canon in cases like this one, in which the scope of the General Assembly's power is at issue. "[O]ur State Constitution is not a grant of power. All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989) (citation omitted) (first citing *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961); then citing *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S. Ct. 985 (1959); and then citing *Greensboro-High Point Airport Auth. v. Johnson*, 226 N.C. 1, 8, 36 S.E.2d

803, 809 (1946)).[7]  "Unless the Constitution *expressly* or by *necessary implication* restricts the actions of the legislative branch, the General Assembly is free to implement legislation as long as that legislation does not offend some specific constitutional provision." *Baker*, 330 N.C. at 338-39, 410 S.E.2d at 891-92; *see id.* at 343, 410 S.E.2d at 896 (Mitchell, J., dissenting) (asserting that the *expressio unius* canon "should not be applied blindly in cases of state constitutional interpretation"). In the context of finding limitations on the General Assembly's power, therefore, the constitution must *necessarily imply* any reasonable negative inference if we are to draw that inference through the use of the *expressio unius* canon.

The two provisions in question here do have a necessary implication, but not one that limits the General Assembly's power.  The necessary inference to be drawn from the fact that the constitution *requires* some form of legislative confirmation as to certain constitutional officers—but stays silent on the method of selection of statutory officers—is that the constitution *does not require* some form of legislative confirmation as to statutory officers.  That is essentially what we held in *McCrory*.

---

[7] This is a fundamental distinction between our state and federal constitutions.  The Constitution of the United States is a grant of power to the federal government—that is, the federal government can act only in ways *permitted* by the Constitution.  *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819) (stating that the federal government "is acknowledged by all to be one of enumerated powers" that "can exercise only the powers granted to it").  Our state constitution, by contrast, functions in the opposite manner—that is, the General Assembly is generally free to act unless *prohibited* by our constitution.  *See, e.g.*, *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570-71, 21 S.E. 787, 787 (1895) ("The only limitation upon [the General Assembly's] power is found in the organic law, as declared by the delegates of the people in convention assembled from time to time.").

In saying that the appointments clause, standing alone, does not prohibit the General Assembly from giving itself the power to appoint certain statutory officers outright, we were saying that the appointments process did not have to conform to the processes specified in the two constitutional provisions in question. *See McCrory*, 368 N.C. at 644, 781 S.E.2d at 255. In other words, the reasonable inference to be drawn from the constitution's failure to specify how statutory officers are to be appointed or otherwise selected is that the constitution simply leaves this matter to be determined by the political process.

We reached a similar decision in *In re Spivey*, where we addressed the respondent's argument that, because district attorneys are "independent constitutional officer[s]," they can be removed only by impeachment. *In re Spivey*, 345 N.C. 404, 410, 480 S.E.2d 693, 696 (1997). We used the *expressio unius* canon[8] to hold that, because the constitution and an arguably pertinent statute "expressly provide[d] that most constitutional officers are removable by impeachment" but did not "provide[ ] that district attorneys are subject to removal by impeachment," neither the constitution nor the statute subjected district attorneys to removal by impeachment. *Id.* at 412, 480 S.E.2d at 697. *Spivey* therefore construed the absence of a method of removal that is stated elsewhere in the constitution to mean that the

---

[8] In *Spivey*, we called the *expressio unius* canon by its alternative name—"*inclusio unius est exclusio alterius* (inclusion of one is exclusion of another)," *id.* at 412, 480 S.E.2d at 697; *see also* Scalia & Garner, at 107 (explaining that *expressio unius* and *inclusion unius* are interchangeable names for the same interpretive canon).

constitution does not *require* that method of removal where it is absent. That is precisely analogous to how we construe the constitutional provisions that plaintiff raises here: the absence of a legislative confirmation requirement elsewhere in the constitution means that the constitution does not require statutory officers to be confirmed by the legislature. Nothing more, nothing less.

In contrast, plaintiff suggests that, when the constitution requires a process in one circumstance, it implicitly *prohibits* that process from being used in all other circumstances. But if we drew *that* inference, plaintiff's argument would be self-defeating. After all, the constitution delegates to the Governor the power to nominate or appoint a number of constitutional officers—in these two provisions and in others. *See also, e.g.*, N.C. Const. art. III, § 7(3) (granting the Governor the power to fill vacant offices in the Council of State); *id.* art. IV, § 19 (granting the Governor the power to fill vacant Article IV offices unless another process is constitutionally specified). As with the two provisions that give the General Assembly some form of confirmation power over constitutional officers, these provisions give the *Governor* the power to nominate or appoint constitutional officers. But, just as no constitutional provision gives the General Assembly the power to confirm statutory officers, no constitutional provision gives the Governor the power to nominate or appoint statutory officers. Thus, applying plaintiff's suggested interpretation, it would follow that the Governor could not nominate or appoint statutory officers. This does *not* follow, however, and the constitution permits, but does not require, the

Governor to be able to nominate and appoint statutory officers. It likewise permits, but does not require, the General Assembly to be able to confirm statutory officers.

In so concluding, we acknowledge that plaintiff cites several cases from our sister states in support of his *expressio unius* argument. But using out-of-state cases as persuasive authority in interpreting our own constitution can be ill-advised; each state constitution has its own unique history of development, both in terms of the constitutional text itself and of the judiciary's interpretation of that text. *See, e.g.*, *McCrory*, 368 N.C. at 640-44, 781 S.E.2d at 253-55 (discussing the history of the appointment power in North Carolina with reference to a number of state-specific constitutional ratifications and amendments); *Rampton v. Barlow*, 464 P.2d 378, 379 (Utah 1970) (discussing the connection between the Constitution of Utah and the Organic Act creating the Territory of Utah). The opinions that plaintiff cites from Alaska and Utah are a case in point. They stand only for the proposition that, *when the appointment power is an executive power*, the legislature may not confirm gubernatorial appointees unless the state constitution expressly permits it to do so. *See Bradner v. Hammond*, 553 P.2d 1, 7 (Alaska 1976) ("[U]nder Alaska's constitution the appointment of subordinate executive officers by the governor is an executive function . . . ."); *Matheson v. Ferry*, 657 P.2d 240, 245 (Utah 1982) (Stewart, J., concurring). But as we have already discussed, our courts have long held that the appointment power in North Carolina is "not an executive, legislative or judicial power, but only a mode of filling the offices created by law." *Cunningham*, 124 N.C.

at 643, 33 S.E. at 139; *see also McCrory*, 368 N.C. at 648, 781 S.E.2d at 258

("[A]ppointing statutory officers is not an exclusively executive prerogative.").[9] Thus,

these opinions reach a different result than we do because they rest on a different

premise that arises from different texts and histories.

In declining to adopt plaintiff's application of the *expressio unius* canon, we do

not, as he suggests, render superfluous the language of the two constitutional

---

[9] Though the states are not unanimous in this view of the appointment power, North Carolina is hardly an outlier in this respect. This theory of the appointment power is long established and remains the law both here and in a number of other jurisdictions. *See, e.g.*, *Clinton v. Clinton*, 305 Ark. 585, 590, 810 S.W.2d 923, 926 (1991) (reaffirming "that there was no inherent appointment power in the Governor" (emphasis omitted) (citing *Cox v. State*, 72 Ark. 94, 78 S.W. 756 (1904))); *Marine Forests Soc'y v. Cal. Coastal Comm'n*, 36 Cal. 4th 1, 34, 113 P.3d 1062, 1080 (2005) (reaffirming the principle that "[t]he power to fill an office is political, and this power is exercised in common by the Legislatures, the Governors, and other executive officers, of every State in the Union, unless it has been expressly withdrawn, by the organic law of the State" (quoting *People ex rel. Aylett v. Langdon*, 8 Cal. 1, 16 (1857))); *Stroger v. Reg'l Transp. Auth.*, 201 Ill. 2d 508, 527, 778 N.E.2d 683, 694 (2002) (reaffirming the principle that "[t]he power to appoint to office is not inherent in the executive department unless conferred by the constitution or the legislature" and that "[t]he creation of officers, the delegation and regulation of the powers and duties of officers and the prescribing of the manner of their appointment or election are legislative functions, which are restrained only by the Constitution" (quoting *People ex rel. Gullett v. McCullough*, 254 Ill. 9, 16, 98 N.E. 156, 158 (1912))); *Schisler v. State*, 394 Md. 519, 584, 907 A.2d 175, 213-14 (2006) (explaining "that the Legislature can by express provision in a prospective statute commit the appointment process to entities other than the Executive," reaffirming that court's earlier holding in *Mayor of Baltimore v. State*, 15 Md. 376, 455 (1860)); *State ex rel. Clarke v. Irwin*, 5 Nev. 111, 127 (1869) (stating that, "[i]n the Constitution of the State of Nevada, the appointing power of the Legislature is neither cut up by the roots, nor in any manner hampered, save where the Constitution itself . . . provides for filling a vacancy"); *Richardson v. Young*, 122 Tenn. 471, 515-16, 125 S.W. 664, 674 (1909) ("We have no difficulty in coming to the conclusion that [the appointment] power, under the constitution of this State, is not an executive function, inherently in the executive department when not otherwise expressly vested, but a political power, which, consistently with the distribution of powers of government, may properly be vested in either the legislative, executive, or judicial departments by the general assembly.").

provisions that require some form of legislative confirmation. Consider the appointments clause: "The Governor shall nominate and *by and with the advice and consent of a majority of the Senators* appoint all officers whose appointments are not otherwise provided for." N.C. Const. art. III, § 5(8) (emphasis added). If one were to remove the language that we have italicized, the Governor is left with the complete power to "nominate and appoint" constitutional officers—a power that is not subject to any form of legislative confirmation. Alternatively, if one were to remove the italicized language plus the word "and" before it and the word "appoint" after it, the appointments clause would be incomplete; it would describe only how constitutional officers "whose appointments are not otherwise provided for" are to be *nominated*, not how they are to be appointed. Either way, removing the language requiring senatorial confirmation would alter the meaning of the appointments clause. Thus, that language is not superfluous, even if one rejects plaintiff's *expressio unius* argument.

So too with the Board of Education provision. If one were to remove the confirmation requirement from Article IX, Section 4(1), the clause in question would simply provide for "eleven members" of that Board to be "appointed by the Governor"—full stop. That too would morph the Governor's appointment power from one that is subject to legislative confirmation to one that is not, even accepting our application of the *expressio unius* canon. As a result, the legislative confirmation language in this provision is also not superfluous.

Next, quoting the report of the North Carolina Study Commission that drafted our current constitution, plaintiff argues that—because our constitution restricts, rather than enumerates, the General Assembly's power—a constitutional provision that "may appear in form to be a grant of authority to the General Assembly to act on a particular matter normally is in legal effect a limitation, not a grant." *Report of the North Carolina State Constitution Study Commission* 2 (1968). In light of the rule expressed in this statement, plaintiff concludes that the two provisions of the constitution that confer confirmation capability on the General Assembly show that the General Assembly has no *general* power to confirm. Accordingly, plaintiff maintains, these provisions must actually *limit* the General Assembly's ability to confirm to the two constitutionally specified instances.

We do not have to decide, and do not decide, whether the statement from the Commission report that plaintiff quotes is accurate. It is enough to say that its use of the word "normally" permits exceptions to its purported rule, and that, even if that rule is correct, the two constitutional provisions in question would both qualify as exceptions to it. The grant of power to the General Assembly in those provisions must be viewed hand-in-hand with the power that those provisions grant to the Governor. When viewed in this way, it is easy see that, when the constitution creates appointments processes in which both the General Assembly and the Governor have a role, it needs to specify the power of both actors in those processes. That is all that the constitution has done here. Accordingly, those provisions specifying the

appointments processes of constitutional officers should not be read as limitations on the General Assembly as to the appointments of statutory officers.

Finally, plaintiff takes issue with the language of subsection 143B-9(a) that requires Cabinet members to be confirmed "in conformance with" the appointments clause. He claims that, because the appointments clause applies only to constitutional officers, the appointments clause cannot "authorize" the General Assembly to require senatorial confirmation of Cabinet members.

But, as plaintiff concedes, our constitution does not enumerate the powers of the General Assembly. As we have already mentioned, unlike the powers of Congress in the federal model, the General Assembly has the power to legislate on all matters unless the constitution prohibits it from doing so. *See McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891 ("All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it."); *see also Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam) ("[T]he power [that] remains with the people . . . is exercised through the General Assembly . . . ."). Thus, the General Assembly need not identify the constitutional source of its power when it enacts statutes. In fact, in most instances, there will be no particular grant of constitutional authority on which the General Assembly will rely. It will instead rely on its general power to legislate, which it retains as an arm of the people.

Plaintiff's argument therefore makes sense only in conjunction with one or more of his earlier arguments that the constitution implicitly limits the General Assembly's legislative confirmation power to the two instances enumerated in the appointments clause and in Article IX, Section 4(1). His argument is predicated, in other words, on the theory that the constitution elsewhere limits the General Assembly's authority to confirm executive officers, which would then require express constitutional authorization for the General Assembly to be able to call for senatorial confirmation in this instance. Because plaintiff's earlier arguments are unavailing, though, this argument is as well.

Notably, under our analysis, subsection 143B-9(a) would still be constitutional even if the General Assembly had mistakenly intended the "in conformance with" phrase to identify the constitutional source of its authority. The General Assembly would still *in fact* have the authority to enact this statutory provision as long as its enactment was not otherwise prohibited by the constitution—which it is not. And we would therefore uphold the statute as a valid exercise of that authority—even if the General Assembly had not properly identified the source of its authority.

But it is also worth noting that the "in conformance with" language does not appear to be intended to provide constitutional authority for the General Assembly's enactment anyway. *McCrory* clearly holds that the appointments clause refers only to constitutional officers, not to statutory ones. *See* 368 N.C. at 644, 781 S.E.2d at 255. We have long held that "[t]he Legislature is presumed to know the law." *Purnell*

*v. Page*, 133 N.C. 125, 130, 45 S.E. 534, 536 (1903). And it is undisputed that the General Assembly added the senatorial confirmation language to subsection 143B-9(a) after we handed down *McCrory*. We therefore presume that the General Assembly knew that the appointments clause could not be the source of its authority to require senatorial confirmation of Cabinet members. The best reading of the "in conformance with" language, then, is that it does *not* provide the source of the General Assembly's constitutional authority; rather, it simply requires that the appointments process for Cabinet members mirror the process recited in the appointments clause. After all, if one removes the phrase "in conformance with Section 5(8) of Article III of the North Carolina Constitution" from subsection 143B-9(a), the statute would fail to tell us how many senators must consent in order to confirm the Governor's appointees. By including that language, the statute appears to be telling us that a majority of senators must consent in order for a Cabinet member to be confirmed.

Because none of plaintiff's arguments about how to properly construe the two legislative confirmation provisions in the constitution are convincing, these arguments do not give us any basis on which to hold the senatorial confirmation provision in subsection 143B-9(a) unconstitutional.

It has long been the practice of the General Assembly, moreover, to require confirmation of certain gubernatorial nominees to statutory offices. *See, e.g.*, An Act of March 8, 1941, ch. 97, sec. 2, 1943 N.C. Pub. [Sess.] Laws 151, 151 (codified as amended at N.C.G.S. § 62-10(a) (2017 & Supp. 2018)) (requiring legislative

confirmation of gubernatorial nominees for the North Carolina Utilities Commission); *see also* Current Operations and Capital Improvements Appropriations Act of 2014, ch. 100, sec. 18B.6, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 328, 539 (codified as amended at N.C.G.S. § 7A-45.1(a10) (2017)) (requiring legislative confirmation of gubernatorial nominees for special superior court judgeships); Protecting and Putting North Carolina Back to Work Act, ch. 287, sec. 17, 2011 N.C. Sess. Laws 1087, 1099 (codified as amended at N.C.G.S. § 97-77(a), (a1) (2017 & Supp. 2018)) (requiring legislative confirmation of gubernatorial nominees for the North Carolina Industrial Commission). Because these appointments processes are consistent with the demands of the constitution, "it is entirely within the power of the Legislature to deal with [statutory officers] as public policy may suggest and public interest may demand." *N.C. State Bd. of Educ. v. State*, ___ N.C. ___, ___, 815 S.E.2d 67, 74 (2018) (quoting *Mial v. Ellington*, 134 N.C. 131, 162, 46 S.E. 961, 971 (1903)).

\* \* \*

The separation of powers clause safeguards the Governor's ability to have enough control over his Cabinet members to perform his duty under the take care clause. Because Cabinet members play such a critical role in executive branch functions, the Governor's control over them must be significant. Here, however, the Governor has unfettered power to nominate any eligible individual to serve in his Cabinet, has significant supervisory power over his Cabinet members, and has the power to remove Cabinet members at will. The constitution, moreover, does not

otherwise prohibit the General Assembly from requiring senatorial confirmation of members of the Governor's Cabinet. As a result, the appointments provision of subsection 143B-9(a) withstands plaintiff's facial constitutional challenge. We therefore affirm the decision of the Court of Appeals.

AFFIRMED.