IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-440

Filed 15 October 2025

Wake County, No. 23CV028505-910

JOSHUA H. STEIN, in his official capacity as GOVERNOR OF THE STATE OF NORTH CAROLINA, Plaintiff,

v.

PHILIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; DESTIN C. HALL, in his official capacity as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; THE STATE OF NORTH CAROLINA; NORTH CAROLINA ENVIRONMENTAL MANAGEMENT COMMISSION; and JOHN (JD) SOLOMON, in his official capacity as CHAIR of the North Carolina Environmental Management Commission; CHRISTOPHER M. DUGGAN, in his official capacity as VICE-CHAIR of the North Carolina Environmental Management Commission; and YVONNE C. BAILEY, TIMOTHY M. BAUMGARTNER, CHARLES S. CARTER, MARION DEERHAKE, MICHAEL S. ELLISON, STEVEN P. KEEN, H. KIM LYERLY, JACQUELINE M. GIBSON, JOSEPH REARDON, ROBIN SMITH, KEVIN L. TWEEDY, ELIZABETH J. WEESE, and BILL YARBOROUGH, in their official capacities as COMMISSIONERS of the North Carolina Environmental Management Commission, Defendants.

Cross appeals by Plaintiff and Defendants from order entered 28 February 2024 by Judges John W. Dunlow, Dawn M. Layton, and Paul A. Holcombe III in Wake County Superior Court. Heard in the Court of Appeals 17 February 2025.

*Attorney General Jeff Jackson, by Deputy Solicitors General James W. Doggett and Daniel P. Mosteller, Special Deputy Attorney General Stephanie A. Brennan, and Senior Deputy Attorney General Amar Majmundar, for the State.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jim W. Phillips, Jr., Daniel F. E. Smith, Eric M. David, and Amanda S. Hawkins, for Plaintiff Joshua H. Stein, Governor of the State of North Carolina.*

*Womble Bond Dickinson (US) LLP, by Matthew F. Tilley, Russ Ferguson, Sean E. Andrussier, Michael A. Ingersoll, and Emmett Whelan, for Philp E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Destin C. Hall, in his official capacity as Speaker of the North Carolina House of Representatives.*

*Southern Environmental Law Center, by Blakely E. Hildebrand, Brooks Rainey Pearson, and Kimberly Hunter, for Cape Fear River Watch and Haw River Assembly, amicus curiae.*

*Poyner Spruill LLP, by Andrew H. Erteschik, Edwin M. Speas, Jr., Caroline P. Mackie, and N. Cosmo Zinkow, for Former Governors James G. Martin, James B. Hunt, Jr., Michael F. Easley, Beverly E. Perdue, and Patrick L. McCrory, amicus curiae.*

*Dowling PLLC, by Troy D. Shelton and Craig D. Schauer, and North Carolina Home Builders Association, by J. Michael Carpenter, for the North Carolina Home Builders Association, amicus curiae.*

*North Carolina Institute for Constitutional Law, by Jeanette K. Doran, for the North Carolina Institute for Constitutional Law and the John Locke Foundation, amicus curiae.*

CARPENTER, Judge.

Joshua H. Stein, in his official capacity as Governor of the State of North Carolina; Philip E. Berger, in his official capacity as President *Pro Tempore* of the North Carolina Senate, and Destin C. Hall, in his official capacity as Speaker of the North Carolina House of Representatives (collectively, "Legislative Defendants"); and the State appeal from the 28 February 2024 order entered by a three-judge panel in Wake County Superior Court (the "Order"). The Order granted in part and denied in part the motions for summary judgment filed by Plaintiff and Legislative Defendants, addressing the constitutionality of two legislative enactments that restructured

seven state boards and commissions. On appeal, the Governor and State argue the panel erred by denying in part the Governor's motion for summary judgment, while Legislative Defendants argue the panel erred by denying in part their motion for summary judgment. After careful review, we affirm in part and reverse in part.

## I. Factual & Procedural Background

In 2023, the North Carolina General Assembly enacted Senate Bill 512 ("SB 512") and House Bill 488 ("HB 488"). S.L. 2023-136, -108. Together, SB 512 and HB 488 restructured the membership and composition of seven state boards and commissions, including the: Board of Transportation ("BOT"), Economic Investment Committee ("EIC"), Commission for Public Health ("CPH"), Environmental Management Commission ("EMC"), Coastal Resources Commission ("CRC"), Wildlife Resources Commission ("WRC"), and Building Code Council ("BCC"). S.L. 2023-136, -108.

On 10 October 2023, the Governor brought suit challenging the enactment of SB 512 and HB 488 by filing: a motion for temporary restraining order, a motion for preliminary injunction, and a request to transfer the case to a three-judge superior court panel following the resolution of the motion for temporary restraining order. The Governor argued the General Assembly's restructuring of the seven boards and commissions violated the separation of powers clause of Article I, Section 6 of the North Carolina Constitution. The State supported the Governor's motion for preliminary injunction. On 11 October 2023, the superior court granted Legislative

Defendants' motion to transfer the case to a three-judge panel.[1] On 1 November 2023, the panel conducted a hearing on the Governor's motion for preliminary injunction and partially granted the Governor's motion as to the BOT, EIC, and CPH. The panel, however, denied the Governor's motion as to the EMC and CRC. In addition, the panel dismissed without prejudice the Governor's motion concerning the WRC and BCC.

On 8 December 2023, the Governor and Legislative Defendants filed motions for summary judgment, which the panel heard on 16 February 2024. On 28 February 2024, the panel entered the Order, partially granting the Governor's motion as to the BOT and EIC after concluding their restructuring violated separation of powers. The panel partially granted Legislative Defendants' motion as to the remaining five boards and commissions, after concluding their restructuring did not violate separation of powers. In sum, the panel enjoined the restructuring of the BOT and EIC, and allowed the restructuring of the CPH, EMC, CRC, WRC, and BCC. The Governor, Legislative Defendants, and State all timely appealed to this Court.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. § 7A-27(b)(1) (2023).

## III. Issues

---

[1] Facial challenges "to the validity of an act of the General Assembly" shall be appointed "to a three-judge panel of the Superior Court of Wake County to hear the challenge." N.C. Gen. Stat. § 1-267.1 (2023).

The issues are whether the panel erred by: (1) enjoining the restructuring of the BOT and EIC; and (2) allowing the restructuring of the CPH, EMC, CRC, WRC, and BCC.

## IV. Analysis

The Governor and State argue the panel erred by denying in part the Governor's motion for summary judgment, thereby allowing the restructuring of the CPH, EMC, CRC, WRC, and BCC. Legislative Defendants argue the panel erred by denying in part their motion for summary judgment, thereby enjoining the restructuring of the BOT and EIC. In essence, the Governor and State contend the restructuring of the seven boards and commissions violates the separation of powers clause of Article I, Section 6 of the North Carolina Constitution, whereas Legislative Defendants disagree.

This Court reviews an order granting or denying a motion for summary judgment de novo. *Cummings v. Carroll*, 379 N.C. 347, 358, 866 S.E.2d 675, 684 (2021). In conducting a de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (quoting *In re Greens of Pine Glen Ltd. P'Ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

We also review constitutional arguments de novo. *Town of Highlands v. Hendricks*, 164 N.C. App. 474, 478, 596 S.E.2d 440, 444 (2004). Under de novo review,

"we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016); *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989) ("[G]reat deference will be paid to acts of the legislature—the agent of the people for enacting laws."). "'The presumption of constitutionality is not, however, and should not be, conclusive,' with an act of the General Assembly being subject to invalidation if it offends a specific constitutional provision beyond a reasonable doubt." *Cooper v. Berger*, 376 N.C. 22, 33, 852 S.E.2d 46, 56 (2020) (quoting *Moore v. Knightdale Bd. of Elections*, 331 N.C. 1, 4, 413 S.E.2d 541, 543 (1992)).

Separation of powers is one of the " 'fundamental principles on which state government is constructed . . . .' " *Cooper v. Berger* (*Cooper I*), 370 N.C. 392, 407, 809 S.E.2d 98, 107 (2018) (quoting John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 50 (2d ed. 2013)). The separation of powers clause of the North Carolina Constitution mandates that the "legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. "[I]n other words, each branch is directed to perform its assigned duties and avoid encroaching on the duties of another branch." *Harper v. Hall*, 384 N.C. 292, 297, 886 S.E.2d 393, 399 (2023).

The North Carolina Constitution also provides that the "Governor shall take care that the laws be faithfully executed." N.C. Const. art. III, § 5(4). But "the

Governor is not alone in this task." *Cooper v. Berger* (*Cooper Confirmation*), 371 N.C. 799, 800, 822 S.E.2d 286, 290 (2018). In addition to the Governor, nine elected officers "assist the executive branch in fulfilling its purpose," including the: Lieutenant Governor, Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of Agriculture, Commissioner of Labor, and Commissioner of Insurance. *Id.* at 800, 822 S.E.2d at 290; *see* N.C. Const. art. III, §§ 2, 7. Together, the Governor and the nine executive officers comprise the Council of State. *Cooper Confirmation*, 371 N.C. at 800, 822 S.E.2d at 290; *see* N.C. Const. art. III, § 8. As a result, "the Governor's duty to 'take care that the laws be faithfully executed' . . . is a nonexclusive duty conferred upon all ten Council of State members." *Stein v. Berger*, 387 N.C. 575, 578 n.4, 915 S.E.2d 146, 148 n.4 (2025) (quoting N.C. Const. art. III, § 5(4)).

When a branch is accused of violating separation of powers by encroaching upon the executive branch's authority, we consider whether the accused branch's actions " 'unreasonably disrupt a core power of the executive.' " *McCrory*, 368 N.C. at 645, 781 S.E.2d at 256 (quoting *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2001)). Such action generally occurs when the accused branch "'retains some control' over the executive branch's functions." *See id.* at 645, 781 S.E.2d at 256 (quoting *Wallace v. Bone*, 304 N.C. 591, 608, 286 S.E.2d 79, 88 (1982)). There is, however, no "categorical rule that would resolve every separation of powers challenge" because "each statutory scheme" varies. *Id.* at 646, 781 S.E.2d at 257.

Consequently, "we must resolve each challenge by carefully examining its specific factual and legal context." *Id.* at 646–47, 781 S.E.2d at 257. Separation of powers violations, therefore, can be "more nuanced" and occur "when the actions of one branch prevent another branch from performing its constitutional duties." *Id.* at 645, 781 S.E.2d at 256.

In *McCrory*, the General Assembly enacted a statute authorizing itself to appoint the majority membership of three state commissions. *Id.* at 646, 781 S.E.2d at 256. The commissions were "housed in the executive branch" and responsible for executing state laws by promulgating rules, making determinations consistent with legislation, and issuing permits. *Id.* at 636–37, 781 S.E.2d at 250–51. Because the commissions were executive and administrative in nature, the Governor needed "enough control over them" in order to " 'take care that the laws be faithfully executed.' " *Id.* at 645–46, 781 S.E.2d at 256 (quoting N.C. Const. art. III, § 5(4)). In evaluating the Governor's control over the commissions, the Court considered his ability to "appoint the commissioners, to supervise their day-to-day activities, and to remove them from office." *Id.* at 646, 781 S.E.2d at 256.

But through the challenged statute in *McCrory*, the General Assembly restricted the Governor's ability to appoint, supervise, and remove members of the executive commissions. *Id.* at 646, 781 S.E.2d at 256–57. Indeed, the General Assembly gave itself the authority to appoint the majority of each commission's members, and each commission required a majority quorum for the transaction of

business.  *Id.* at 636–38, 781 S.E.2d at 250–51.  Moreover, the Governor could only remove members from the commissions for "misfeasance, malfeasance, or nonfeasance."  *Id.* at 636–38, 781 S.E.2d at 250–51.  The Court noted:

> When the General Assembly appoints executive officers that the Governor has little power to remove, it can appoint them essentially without the Governor's influence. That leaves the Governor with little control over the views and priorities of the officers that the General Assembly appoints. When those officers form a majority on a commission that has the final say on how to execute the laws, the General Assembly, not the Governor, can exert most of the control over the executive policy that is implemented in any area of the law that the commission regulates.

*Id.* at 647, 781 S.E.2d at 257.  The General Assembly, therefore, violated separation of powers.  *Id.* at 647, 781 S.E.2d at 257.

Similarly, in *Cooper I*, the General Assembly enacted a statute restructuring the State Board of Elections to an eight-member bi-partisan board, where the Governor appointed four members each from two lists submitted by the Republican and Democratic parties.  370 N.C. at 415–16, 809 S.E.2d at 112–13.  In addition, the Governor could only remove members for "misfeasance, malfeasance, or nonfeasance."  *Id.* at 416, 809 S.E.2d at 112 (internal quotation marks and citation omitted).  In effect, the General Assembly restricted the Governor's ability to appoint a majority of the board's members from his political party and remove members at will.  *Id.* at 416, 809 S.E.2d at 112–13.  The Court explained:

> The General Assembly cannot . . . structure an executive

branch commission in such a manner that the Governor is unable, within a reasonable period of time, to "take care that the laws be faithfully executed" because he or she is required to appoint half of the commission members from a list of nominees consisting of individuals who are, in all likelihood, not supportive of, if not openly opposed to, his or her policy preferences while having limited supervisory control over the agency and circumscribed removal authority over commission members. An agency structured in that manner leaves the Governor with little control over the views and priorities of the [majority of] officers and prevents the Governor from having the final say on how to execute the laws.

*Id.* at 418, 809 S.E.2d at 114 (alteration in original) (quoting N.C. Const. art. III, § 5(4)). Accordingly, the General Assembly violated separation of powers. *Id.* at 418, 809 S.E.2d at 114.

Later that year in *Cooper Confirmation*, the General Assembly enacted a statute granting the "North Carolina Senate the power to confirm the people that [the Governor] nominates to serve in his Cabinet." 371 N.C. at 800–01, 822 S.E.2d at 290. Although the General Assembly constrained the Governor's appointment authority over his Cabinet members—as the Governor's nominees required confirmation by the Senate—the Governor still had "the power to nominate them," "strong supervisory authority over them," and "the power to remove them at will." *Id.* at 807, 822 S.E.2d at 294. The Court further explained:

The Governor's power to nominate is significant, and the ultimate appointee will be a person that he alone has chosen, subject only to an up-or-down vote by the Senate. The Governor's supervisory and removal powers, moreover, ensure that the Governor retains ample post-

>appointment control over how his Cabinet members perform their duties.

*Id.* at 801, 822 S.E.2d at 290.  Because the Governor "retain[ed] enough control over the members of his Cabinet to take care that the laws be faithfully executed[,]" the General Assembly did not violate separation of powers.  *Id.* at 809, 822 S.E.2d at 295.

In an earlier case, *Wallace*, the General Assembly enacted a statute authorizing its members to serve on the EMC.  304 N.C. at 607, 286 S.E.2d at 88.  The Court explained it is "crystal clear" that the EMC's duties are "administrative or executive in character."  *See id.* at 608, 286 S.E.2d at 88.  The EMC's duties include: granting and revoking permits; issuing orders; conducting investigations and hearings; supervising air pollution control programs; approving and rejecting applications for dam construction; establishing industry standards; and adopting rules, regulations, and classifications.  *See id.* at 607–08, 286 S.E.2d at 88.  Because "the legislature cannot constitutionally create a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality," the General Assembly violated separation of powers by authorizing its members to serve on the EMC.  *Id.* at 608–09, 286 S.E.2d at 88–89.

As an initial matter, *McCrory* and *Wallace* demonstrate that a state board or commission is administrative or executive in character when its duties function to implement legislation.  *Id.* at 607–09, 286 S.E.2d at 88–89; *McCrory*, 368 N.C. at 645–

47, 781 S.E.2d at 256–57. Specifically, a state board or commission is administrative or executive in character when it is authorized to create and promulgate rules and regulations, make final decisions regarding grants and permits, supervise programs, set standards, conduct investigations, and approve plans or applications. *Wallace*, 304 N.C. at 607, 286 S.E.2d at 88; *McCrory*, 368 N.C. at 636–37, 781 S.E.2d at 250–51

Here, based on their responsibilities described in detail below, the seven state boards and commissions likewise function to implement legislation. *See* N.C. Gen. Stat. § 143B-350 (2023) (BOT); N.C. Gen. Stat. §§ 143B-437.52, -437.54, -437.56, -437.57, -437.60 (2023) (EIC); N.C. Gen. Stat. §§ 130A-9, 130A-22, 130A-29 (2023) (CPH); N.C. Gen. Stat. §§ 143B-282, 143B-282.1 (2023) (EMC); N.C. Gen. Stat. §§ 113A-104, -106.1, -107, -107.1, -113, -118, -134.2 (2023) (CRC); N.C. Gen. Stat. §§ 143B-281.1, 143-239 (2023) (WRC); N.C. Gen. Stat. § 143-136 (2023) (BCC). Because they are primarily executive or administrative in character, we next consider whether the General Assembly violated separation of powers by restructuring the executive branch's control over each board and commission.

**A. BOT**

The BOT oversees the Department of Transportation and "develop[s] transportation policy and projects for the benefit of the citizens of the State." N.C. Gen. Stat. § 143B-350(a). Responsibilities of the BOT include, in pertinent part: formulating "policies and priorities, accountability and performance metrics" for the

Department of Transportation; approving highway construction, construction projects, and partnership agreements; promulgating "rules, regulations, and ordinances concerning all transportation functions assigned" to the Department of Transportation; and reviewing and approving the Department of Transportation's financial decisions. *Id.* § 143B-350(f)-(g). Prior to SB 512, the Governor appointed, and could also remove, fourteen of the BOT's twenty members. S.L. 2023-136, § 4.1.(b). The General Assembly appointed, and could also remove, six members. *Id.* The Governor appointed the chair. *Id.* § 4.1.(e). After SB 512, the Governor appoints and removes six members, while the General Assembly appoints and removes fourteen members. *Id.* § 4.1.(b). The BOT selects its own chair and a majority quorum remains required "for the transaction of business." *Id.* § 4.1.(e).

By restructuring the BOT in this manner, the General Assembly removed, and gave to itself, the executive branch's control over the BOT's majority membership and selection of the chair, as the BOT selects its own chair. Now, given the majority quorum along with the General Assembly's majority control, "the General Assembly, not the Governor, can exert most of the control over the executive policy that is implemented" by the BOT. *See McCrory*, 368 N.C. at 647, 781 S.E.2d at 257. Consequently, the General Assembly disrupted a " 'core power of the executive[,]' " s*ee id.* at 645, 781 S.E.2d at 256 (quoting *Bacon*, 353 N.C. at 717, 549 S.E.2d at 854), by "'retain[ing] some control' over the executive branch's functions[,]" *see id.* at 645, 781 S.E.2d at 256 (quoting *Wallace*, 304 N.C. at 608, 286 S.E.2d at 88). Accordingly,

the General Assembly violated separation of powers. *See id.* at 647, 781 S.E.2d at 257. The panel, therefore, did not err by concluding that the BOT's restructuring violated separation of powers.

**B. EIC**

The EIC oversees the Department of Commerce's Job Development Investment Grant Program. N.C. Gen. Stat. § 143B-437.52(a). Responsibilities of the EIC include: entering "into agreements with businesses to provide grants;" developing "criteria to be used in" the selection of grant recipients; setting the amount of incentives the Department of Commerce will pay recipients; and approving grants paid by the Department of Commerce. *Id.* §§ 143B-437.52, -437.54, -437.56, -437.57, -437.60. Prior to SB 512, the Governor appointed three of the EIC's five members and the General Assembly appointed two members. S.L. 2023-136, § 1.1.(a). The General Assembly was not permitted to appoint its own members to serve as members of the EIC. *Id.* After SB 512, the Governor appoints three members, the General Assembly appoints two members, and the Speaker of the House and President *Pro Tempore* of the Senate, or their designees, serve as two additional members. *Id.* The EIC "may act only upon a decision of a majority of its members." *Id.*

By restructuring the EIC in this manner, the General Assembly removed the Governor's majority-appointment power and increased its own control by designating additional membership spots to the Speaker and President *Pro Tempore*. In effect,

the General Assembly gave itself "the power to appoint a majority of [the EIC's] voting members," *see McCrory*, 368 N.C. at 646, 781 S.E.2d at 256, and ability to serve on the EIC, *see Wallace*, 304 N.C. at 608, 286 S.E.2d at 88. As the General Assembly granted itself membership on the EIC and restricted the Governor's appointment power, supervisory ability, and overall influence, it violated separation of powers. *See id.* at 608, 286 S.E.2d at 88; *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256. Accordingly, the panel did not err by concluding that the EIC's restructuring violated separation of powers.

**C. CPH**

The CPH is "authorized to adopt rules necessary to implement the public health programs administered by" the Department of Health and Human Resources; create water, sanitary, and mosquito control districts; and establish "reasonable standards governing the nature and scope of public health services rendered by local health departments." N.C. Gen. Stat. §§ 130A-9, -29(b)-(c). Prior to SB 512, the Governor appointed, and could also remove, nine of the CPH's thirteen members, provided that six members work in specified professions. S.L. 2023-136, § 3.1.(a)-(b). The North Carolina Medical Society appointed, and could also remove, the remaining four members. *Id.* After SB 512, the Governor appoints and removes five members, and all must work in specified professions. *Id.* The North Carolina Medical Society and the General Assembly each appoint and remove four members. *Id.* A majority quorum remains required "for the transaction of business." *Id.* § 3.1.(d).

Despite retaining greater appointment and removal power than the General Assembly following the CPH's restructuring, the Governor appoints and removes five members while the General Assembly and North Carolina Medical Society appoint and remove a combined eight members. Even though the North Carolina Medical Society is a nongovernmental organization, its control, when combined with the control the General Assembly removed from the Governor and vested in itself, restricts the Governor's majority-appointment power, supervisory ability, and influence over the CPH. *See McCrory*, 368 N.C. at 645–47, 781 S.E.2d at 256–57. While the General Assembly "clearly has the authority to establish qualifications for commission membership, . . . mandate that differing policy preferences be reflected in the commission's membership[,]" and provide "the commission with a reasonable degree of independence from short-term political influence[,]" the executive branch must nonetheless be able to " 'take care that the laws be faithfully executed.' " *Cooper I*, 370 N.C. at 417–18, 809 S.E.2d at 113–14 (quoting N.C. Const. art. III, § 5(4)).

Granted, separation of powers violations generally "occur when one branch exercises power that the constitution vests exclusively in another branch." *See McCrory*, 368 N.C. at 645, 781 S.E.2d at 256. The General Assembly, however, does not necessarily possess majority control over the CPH as to allow the General Assembly to directly exercise the executive branch's power to take care that the laws be faithfully executed. Nevertheless, there is "no categorical rule" for separation of powers violations, which can be more "nuanced" and occur "when the actions of one

branch prevent another branch from performing its constitutional duties." *See id.* at 646, 781 S.E.2d at 257. By giving itself control over four members previously controlled by the Governor, where the North Carolina Medical Society already controls four members, the General Assembly has effectively restricted the Governor's control to less than half of the CPH.

Consequently, the General Assembly has "prevent[ed] another branch from performing its constitutional duties." *See id.* at 645, 781 S.E.2d at 256. Indeed, when a majority quorum is required "for the transaction of business" and the Governor only controls five of thirteen members, the executive branch cannot take care that the laws be faithfully executed as there is no guarantee that the members from the North Carolina Medical Society will support the Governor's policy preferences. *See Cooper I*, 370 N.C. at 415–18, 809 S.E.2d at 112–14. Stated differently, given the Governor's "limited supervisory control" and "circumscribed" authority, the Governor is left "with little control over the views and priorities" of the majority of the CPH's members which "prevents the Governor from having the final say on how to execute the laws"— as the CPH can take action without approval from any of the Governor's appointed members. *See id.* at 418, 809 S.E.2d at 114. As a result, the General Assembly violated separation of powers and the panel erred by concluding that the CPH's restructuring was constitutional. *See id.* at 416, 809 S.E.2d at 112.

### D.  EMC, CRC, and WRC

The EMC is housed within the Department of Environmental Quality. N.C.

Gen. Stat. § 143B-282(a). The EMC's responsibilities include promulgating rules for the "protection, preservation, and enhancement of the water and air resources of the State;" overseeing activities related to air and water pollution; and, if necessary, overruling civil penalty assessments made by the Department of Environmental Quality. *Id.* §§ 143B-282, -282.1. Prior to SB 512, the Governor appointed nine of the EMC's fifteen members, while the General Assembly appointed six members. S.L. 2023-136, § 2.1.(a). The Governor selected the chair and could remove all members. *Id.* § 2.1.(a)-(b). After SB 512, the Governor appoints seven members, the General Assembly appoints six members, the Commissioner of Agriculture appoints two members, the EMC selects its own chair, the Governor only removes the members he appoints, and a majority quorum remains required. *Id.*

The CRC is housed within the Department of Environmental Quality. N.C. Gen. Stat. §§ 113A-104(a). The CRC's duties include: designating areas of environmental concern in coastal regions and establishing and administering permit rules in those areas; ruling on appeals contesting permit decisions; deciding whether to allow erosion-control structures in state coastal waters; managing public access points to state beaches; and administering the Public Beach and Coastal Waterfront Access Program. *Id.* §§ 113A-104, -106.1, -107, -107.1, -113, -118, -134.2. Prior to SB 512, the Governor appointed nine of the CRC's thirteen members, the General Assembly appointed four members, and the Governor selected the chair. S.L. 2023-136, § 5.1.(a). After SB 512, the Governor appoints six members, the General

Assembly appoints six members, the Commissioner of Insurance appoints one member, the CRC selects its own chair, and a majority quorum remains required. *Id.*

The WRC is within the Department of Environmental Quality. N.C. Gen. Stat. § 143B-281.1. The WRC's duties include: administering laws relating to game, freshwater fish, and other wildlife resources; developing wildlife management policy for state lands; creating licensing rules regarding hunting, fishing, and use of public lands; and designating species as endangered or threatened and developing conservation plans. N.C. Gen. Stat. §§ 143B-281.1, 143-239. Prior to SB 512, the Governor appointed eleven of the WRC's nineteen members and the General Assembly appointed eight members. S.L. 2023-136, § 6.1.(a)-(b). The Governor selected the chair while the WRC selected the vice-chair. *Id.* After SB 512, the Governor appoints ten members, the General Assembly appoints ten members, and the Commissioner of Agriculture appoints one member. *Id.* The WRC selects its chair and vice-chair, and a majority quorum remains required. *Id.*

While the Governor does not directly appoint a majority of each commission's members, the executive branch holds majority-appointment power. In fact, the Commissioner of Agriculture and Commissioner of Insurance, both members of the Council of State, along with the Governor combine to grant the executive branch majority-appointment power concerning the EMC, CRC, and WRC. Moreover, given the commissions' majority quorums for the transaction of business, the executive branch "can exert most of the control over the executive policy that is implemented"

by the commissions. *See McCrory*, 368 N.C. at 647, 781 S.E.2d at 257. The restructuring of the EMC, CRC, and WRC, therefore, does not violate separation of powers because "the Governor's duty to 'take care that the laws be faithfully executed' . . . is a nonexclusive duty conferred upon all ten Council of State members." *See Stein*, 387 N.C. at 578 n.4, 915 S.E.2d at 148 n.4. Accordingly, the panel did not err by concluding that the restructuring of the EMC, CRC, and WRC was constitutional.

**E. BCC**

HB 488 takes the certain functions belonging to the BCC and assigns them to a new entity, the Residential Code Council ("RCC"). S.L. 2023-108, § 1.(a). The RCC is housed within the Department of Insurance and is responsible for: revising the building codes applicable to residential properties in the State, hearing appeals, and developing formal interpretations of building codes. *Id.*; N.C. Gen. Stat. § 143-136. Prior to HB 488, the Governor appointed all seven members of the BCC, the BCC selected its own chair, and four members were required for the quorum. S.L. 2023-108, § 1.(a). After HB 488, with the RCC performing functions of the BCC, the Governor appoints seven of the RCC's thirteen members, the General Assembly appoints six members, the Governor selects the chair, the chair appoints members to committees, and nine members are required for the quorum. *Id.*

By restructuring the BCC in this manner, the Governor controls the majority and the chair, who controls the composition of committees. While the change in size and voting structure does not guarantee the Governor total control over the RCC's

actions, the Governor nonetheless retains "enough control" because his appointed members constitute seven of the nine members required for the quorum. *See McCrory*, 368 N.C. at 646, 781 S.E.2d at 256; *Cooper Confirmation*, 371 N.C. at 800, 822 S.E.2d at 289–90. Given the quorum requirement, it is not as though the General Assembly's six appointed members can take action without the approval of at least three of the Governor's appointed members. As the General Assembly did not violate separation of powers, the panel did not err by concluding that the restructuring of the BCC was constitutional.

## V. Conclusion

We conclude the General Assembly violated separation of powers by restructuring the BOT, EIC, and CPH. The General Assembly, however, did not violate separation of powers by restructuring the WRC, EMC, CRC, and BCC. Accordingly, we affirm in part and reverse in part.

AFFIRMED in part and REVERSED in part.

Judge TYSON concurs.

Judge MURRY concurs by separate opinion.

No. COA24-440 – *Stein v. Berger*

MURRY, Judge, concurring.

"Deriving a single definition of executive power could never be a simple exercise." Jack N. Rakove, *Original Meaning: Politics and Ideas in the Making of the Constitution* 245 (1996) [hereinafter Rakove, *Original Meaning*]. So too here. Because I agree with each Commission-specific examination of gubernatorial control over the restructured appointment process, I fully concur with the majority's well-reasoned opinion. I write separately, however, for two reasons: (1) to address certain implicit questions of North Carolina's *intra*-Executive Branch separation of powers omitted by Plaintiff in his principal brief and (2) to defend the methodological interpretation most suited to the task of discerning the relevant constitutional provisions at issue— original public meaning based on analogical reasoning from text, history, and precedent.[1] *See* Antonin Scalia, *A Matter of Interpretation* 44–46 (new ed. 2018) [hereinafter Scalia, *Interpretation*]. *Contra, e.g.*, *Harper v. Hall*, 384 N.C. 292, 393 (2023) (Earls, J., dissenting).

## I.  **Executive Structure**

---

[1]  I leave the explanation of other originalist theories to minds far greater than my own. *See generally, e.g.*, Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 10, 16–17 (1971) (proposing jurisprudence based on "[F]ramers' . . . inten[t]" as determined by "text and history"); Keith E. Whittington, *Constitutional Interpretation* 59 (1999) (advocating originalism based on "a prior and fixed idea . . . contained in the textual language"); John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 Nw. U. L. Rev. 751, 752 (2009) (deducing original meaning based on "content of the interpretive rules in place when the Constitution was enacted"); *McKinney v. Goins*, 387 N.C. 35, 60, 62 (2025) (Earls, J., concurring in result) (articulating "extreme originalism" based on circumstantial totality of "confus[ion], extrem[ity], and hypocri[sy]").

As articulated in a separate proceeding, some of Plaintiff's arguments touch upon "the General Assembly's ability to reassign certain duties among executive constitutional officers within the [E]xecutive [B]ranch." *Stein v. Berger*, 387 N.C. 575, 577 (2025) (emphasis omitted). The text of the State Constitution's Article III specifies their respective duties and the General Assembly's role in shaping them. *See* N.C. Const. art. III. Our State's robust corpus of historical scholarship informs that text's meaning as it constitutionally developed. *See, e.g.*, Earle H. Ketcham, *The Sources of the North Carolina Constitution of 1776*, 6 N.C. Hist. Rev. 215, 218–20 (1929) [hereinafter Ketcham, *Sources*]; Emery B. Denny et al., *Report of the N.C. State Constitution Study Commission* 104 (1968) [hereinafter *N.C. Const. Report*]; John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1765–67 (1992) [hereinafter Orth, *N.C. Const. Hist.*]. Our precedents reflect State traditions in recognition of *stare decisis*'s "pedigree in the unwritten common law" of North Carolina. *Gamble v. United States*, 587 U.S. 678, 714 (2019) (Thomas, J., concurring) (citing 1 William Blackstone, *Commentaries* *68–89).

## A. Text

Contrary to the unitary federal executive, *see* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* 30–38 (2008), Article III divides our Executive Branch's powers among the plural Council of State, with the Governor chief among them, N.C. Const. art. III, § 1–2, 7–8. Ratified again in 1971, the Article outlines the structure and occupants of that Branch. Section 1 "vest[s] in the

Governor" "[t]he executive power of the State." *Id.* art. III, § 1. Section 5 specifies at least eleven constitutional duties within the ambit of that power. *E.g., id.* art. III, § 5, cl. 4 (Take Care Clause); *id.* art. III, § 5, cl. 5 (Commander in Chief Clause). Sections 2, 7, and 8 establish the other nine statewide-elected executive officers that collectively form our Council of State, including the Lieutenant Governor. *See id.* art. III, §§ 2, 7–8. Unlike for the Governor, though, Article III specifies only that the Lieutenant Governor "perform such additional duties as the General Assembly or the Governor may assign to h[er]," *id.* art III, § 6, and that the other Councilors' "duties shall be prescribed by law," *id.* art. III, § 7, cl. 2. Article XIV reaffirms the General Assembly's authority to prescribe these "general laws." *Id.* art. XIV, § 3.

Read together, these Clauses "fairly impl[y]," Antonin Scalia & Bryan A. Garner, *Reading Law* 16 (2012), "at least 'three categories' of executive duties" that fall syllogistically far short of some "[un]precedent[ed] . . . framework," *Stein*, 387 N.C. at 591 (Earls, J., dissenting). *First*, the State Constitution does express specific executive duties of the Governor and Lieutenant Governor. *See id.* at 579 (majority op.). *Second*, it does express that other executive duties be specifically "assigned by law." *Id.* Thus, *third*, it *does* imply a potentially broader category of unspecified "duties inherent in a given executive role." *Id.* But true enough, executive inherency is conceptually opaque enough to invite mischief. *See* Arthur M. Schlesinger, Jr., *The Rise of Presidential War*, *in The Imperial Presidency* ch. 3 (1973); *Youngstown Sheet & Tube Co. v. Sawyer* (*Steel Seizure Case*), 343 U.S. 579 (1952). So, unlike in past

3

cases that addressed only *inter*-Branch separations of power, the question is now: To whom and to what extent *within* the State Executive Branch can the General Assembly exercise its legislative power to "alter from time to time" the executive power? N.C. Const. art. III, § 5, cl. 10.

## B. History

Our founding Constitution vested plenary power in the Legislative Branch, with the Judicial and Executive Branches only attaining constitutional vestment in 1868. *Compare* N.C. Const. of 1776, Declaration of Rights, § 1 (legislative vesting clause), *with* N.C. Const. of 1868 art. IV, § 4 (judicial vesting clause), *and id.* art. III, § 1 (executive vesting clause). The current Constitution of 1971 semantically simplified but substantively reaffirmed these grants. *See N.C. Const. Report* 71–73. After both houses rejected the originating bills under Article XIII, *see* H.B. 509, 1969 Gen. Assemb., Reg. Sess. (N.C. 1969); S.B. 272, 1969 Gen. Assemb., Reg. Sess. (N.C. 1969), the General Assembly declined to put an amendment to the voters that would have granted the Governor any veto power.[2] *Contra N.C. Const. Report* 101–06.

The Constitution of 1776 disregarded any pretense of coequality by subjecting all executive officers to an annual legislative election and by "restrain[ing]" their "executive [p]owers . . . according the [l]aws of the State." N.C. Const. of 1776, § XIX;

---

[2] A quarter-century after ratification, the General Assembly reconsidered this decision and put the gubernatorial veto to North Carolina's voters, who collectively ratified an amendment subject to a three-fifths override vote in each house. *See* Act of Mar. 8, 1995, ch. 5, 1995 N.C. Sess. Laws 6.

*see* Ketcham, *Sources* at 218 ("The legislature was composed of two houses[ ] . . . as supreme as ever John Locke might desire."). *Contra The Federalist No.* 68 (Alexander Hamilton). The Constitution of 1868 vested the General Assembly with analogous authority to "prescribe[ ] by law" the duties of every Councilor of State save the Governor himself. N.C. Const. of 1868 art. III, §§ 13–14. To this day, the Assembly has generally defined the scope and balance of these executive duties through its "prescri[ption of] the functions, powers, and duties of the administrative departments and agencies of the State," N.C. Const. art. III, § 5, cl. 10, run by those Councilors whose authorities it "prescribe[s] by law," *id.* art III., § 7, cl. 2.

The opposing two Branches and our citizenry have repeatedly acknowledged the General Assembly's relative power throughout the intervening centuries. *See, e.g., Trs. of Univ. v. Foy*, 2 Hayw. 310, 320 (1804) ("The authority of the Executive is too confined" "[by] the [C]onstitution" "to . . . give[ ] cause for apprehension . . . ."); Members of the Gen. Assemb.—Privilege, 19 N.C. Op. Att'ys Gen. 67 (1926–1928) ("Under our Constitution, the Legislative Department is the residuum of all power not otherwise conferred or retained."); *N.C. Const. Report* 104 ("In North Carolina, most of the Governor's powers derive from statute, not the [C]onstitution."). Thus, our Constitution "has its own unique history" of executive power and coequality notions "both in terms of the constitutional text itself and of [our] judiciary's interpretation of that text." *Cooper v. Berger*, 371 N.C. 799, 813 (2018).

### C. Precedent *Qua* Tradition

By structuralizing the Governor's historical position as "only the leading member" of a "plural body" "elected either by the assembly or by the people at large," Rakove, *Original Meaning* 252, our Constitution's particularly plural executive requires "unique state . . . theoretical considerations" inapposite to the federal presidency,[3] Jonathan L. Marshfield, *America's Other Separation of Powers Tradition*, 73 Duke L.J. 545, 575–77 (2023) (critiquing *Cooper v. Berger*¸ 371 N.C. 799, on those grounds). State-specific considerations relevant here include at least, *one*, the historical and practical concentration of governmental power in the General Assembly relative to its sibling Branches, *see* Orth, *N.C. Const. Hist.*, 70 N.C. L. Rev. at 1762–63; *Harper*, 384 N.C. at 322 (majority op.), *two*, that same Assembly's legislative ability to strip the Governor "of many of [his] present powers" "in a moment of rashness," *N.C. Const. Report* 104, *three*, the "clear potential for conflict between" "constitutional[ly] independ[ent] . . . office[r]s" of the Executive Branch as a result of "their differing functions and duties," *Tice v. Dep't of Transp.*, 67 N.C. App. 48, 54 (1984), and, *four*, a State Founding Father's recognition that we lack the judicial "authori[ty] to say that an act is absolutely void merely because, in the

---

[3] Our courts' interpretations of the State Constitution's separation of powers between its Branches regularly diverge from those of its federal counterparts (and with some occasional significance). *Contrast, e.g.*, *Bacon v. Lee*, 353 N.C. 696, 717 (2001) (reasoning that "judicial review of the exercise of clemency" over a convicted felon "would unreasonably disrupt a core power" of North Carolina's Governor), *with* Bob Woodward & Scott Armstrong, *The Brethren* 415 (1st pbk. ed. 2005) ("jettison[ing]" of Chief Justice Burger's draft "core functions argument" by Associate Justices for what became a "due process" "basis" in *United States v. Nixon*, 418 U.S. 683 (1974)).

opinion of the court, it is contrary to natural justice," *Minge v. Gilmour*, 17 F. Cas. 440, 444 (C.C.D.N.C. 1798) (No. 9,631) (Iredell, Circuit Justice) (interpreting North Carolina's Law of the Land, Jury Trial, and Ex Post Facto Clauses).

## II.    Original Public Meaning

Recent State and Federal bench proclamations compel a recurrence to fundamental principles of interpretation that I believe should and must control the resolution of these issues. *E.g.*, *State v. Chambers*, 387 N.C. 521, 530 (2025) (Riggs, J., concurring in part and dissenting in part) (rejecting "arcane originalism"); *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2089 n.12 (2025) (Jackson, J., dissenting) (dismissing "incessantly malleable" textualism). Like purposivism and pragmatism, originalism and textualism[4] are jurisprudential schools with divergent individual conceptions of the "correct" inputs and assumptions. *See* Stephen Breyer, *Reading the Constitution: Why I Choose Pragmatism,* Not *Textualism* 104–09 (2024) [hereinafter Breyer, *Constitution*]; Keith E. Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* 35–37 (1999). But all of them draw upon certain fundamental canons of interpretation in hopes of respecting the (small-r) republican principles of *representative* democracy. *Compare* Breyer,

---

[4] Although bound in part by mutual disregard for drafters' intent, *contra McKinney*, 387 N.C. at 61–62, textualism focuses on the written text to the exclusion of its "broader social purposes," Antonin Scalia, *A Matter of Interpretation* 23 (new ed. 2018). It typically (but not exclusively) applies to statutes instead of constitutions for reasons beyond the scope of this concurrence. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 16–26 (2012) [hereinafter Scalia & Garner, *Reading Law*].

*Constitution* at 105 ("[A] purpose-oriented approach . . . is more consistent with the democratic values upon which legislation rests."), *with* Scalia, *Interpretation* 131–33 ("The criterion of 'legislative intent['] . . . invites the judge to impose his will.").

## A. Principles

Quite unlike the former two schools, however, originalists emphatically reject the "idea that doctrine, ethos, or prudential concerns can trump the communicative content of the constitutional text." Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 Fordham L. Rev. 453, 482 (2013) [hereinafter Solum, *Originalism*]. We instead center a constitution's "text, history, and tradition." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 79 (2022) (Kavanaugh, J., concurring). In lieu of "tradition" per se, though, North Carolinian jurists draw upon precedent to acknowledge both our predecessors' adjudications, *e.g.*, *Ballard v. Hill's Heirs*, 3 Mur. 410, 414 (1819) ("conne[ct]ion with . . . history"); *State ex rel. Wilson v. Jordan*, 124 N.C. 683, 694–95 (1899) ("doctrine of *Hoke v. Henderson*[, 4 Dev. 1 (1833)]"); *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639 (2016) ("text, . . . historical context, . . . and our precedents"), and the States' collective font of American common law, *see* N.C.G.S. § 4-1 (2023); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

So we ground our consideration of the three hierarchical factors—text, history, and precedent—on the twin principles of (1) legal "fixation" by which a provision's meaning *is* determined at the certain point our citizenry commonly understood it as ratified and (2) normative "constraint" by which we *ought* to reduce the projection of

our subjective value judgments onto positive law.[5] Solum, *Originalism* at 459–60. Contrary to the exclamations of its harshest critics (and, yes, some of its biggest fans), originalism properly understood does not purport to be "a mechanical process" and does "require judgment" to reach the *most accurate* constitutional meaning. Keith E. Whittington, *The New Originalism*, 2 Geo. J.L. & Pub. Pol'y 599, 611 (2004). But it also decreases the risk of mistaking individual policy preferences for common law or constitutional doctrine, *see, e.g.*, *N.C. State Conf. of NCAAP v. Moore*, 382 N.C. 129, 160–65 (2022), in search of "a roving jurisdiction to do good." Bob Woodward & Scott Armstrong, *The Brethren* 106 (1st pbk. ed. 2005) (quoting then-Justice Hugo Black).

## B. Considerations

---

[5] To be sure, originalism lacks the epistemic "illuminat[ion of] a path," *State v. Borlase*, 387 N.C. 295, 327 (2025) (Earls & Riggs, JJ., dissenting), towards those "evolving standards of decency that mark the progress of a maturing society," *State v. Kelliher*, 381 N.C. 558, 596 (2022); *State v. Conner*, 381 N.C. 643, 660 (2022); *Dewalt v. Hooks*, 382 N.C. 340, 355 (2022) (Earls, J., dissenting). But after five decades of open debate in the classroom, courtroom, and public square, its established framework is hardly "pseudo-intellectual[ ]." *McKinney v. Goins*, 387 N.C. 35, 61 (2025) (Earls, J., concurring in result).

By virtue of the General Assembly's de facto (much less de jure) supremacy through the people, our State courts lack the opportunities for platonic guardianship that living constitutionalism and its "noninterpretivist" derivatives offer, John Hart Ely, *Democracy and Distrust* 88 n. (1980) ("seeking . . . constitutional judgment in one's [own] rendition of society's fundamental values")—all theories of jurisprudence enviably unburdened by constitutional text, electoral accountability, or self-doubt, *see, e.g.*, *McKinney*, 387 N.C. at 60 n.1 (criticizing majority's use of "a stagnant, archaic, hidebound document steeped in the prejudices and superstitions of a time long past" (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 141 (1989) (Brennan, J., dissenting)); *accord* Stuart Banner, *The Most Powerful Court in the World* 406 (2024) (then-President Johnson admitting that "to amend the [Federal] Constitution[,] we need a 2/3 majority in Congress and then a vote of 3/4 of the [S]tates" but that then-Justice William Douglas "can do it in one afternoon" (quoting Mr. Justice Douglas' Twenty-Fifth Anniversary on the Supreme Court: Dinner Proceedings 3 (May 14, 1964) (on file with F.D.R. Presid'l Libr., James H. Rowe, Jr. Papers, Box 89))).

Plaintiff implausibly asserts that the Council of State's executive status is "irrelevant" to his "duty to take care the laws are faithfully executed." But that category of authorities "inherent in a given executive role," *Stein*, 368 N.C. at 579, definitionally falls outside the State Constitution's textually committed separation of powers, thus creating a "construction zone"[6] of "concurrent authorit[ies] . . . in which [their] distribution is uncertain," Solum, *Originalism* at 502 (quoting *Steel Seizure Case*, 343 U.S. at 637 (Jackson, J., concurring)).

To wit, the majority correctly upholds the constitutionality of restructuring the WRC, EMC, and CRC into the Agriculture and Insurance Commissioners' portfolios because doing so preserves the power of the Executive Branch relative to the Legislative. But that conclusion leaves open questions of the assignments to those discrete Councilors per se. These assignments certainly fall within the conceptually "major purposes" of the Councilors' respective "core constitutional roles." *Stein*, 387 N.C. at 581–82 (Deitz, J., concurring) (quoting N.C. Const. art. III, § 11). But the Major Purposes Clause may plausibly modify "as part of its core prepositional phrase" the possible "head noun," *State v. Jenkins*, COA24-899, 2025 WL 2232043, at *5 (N.C.

---

[6] At the risk of (more) pretension, I refer only to a situation "where the communicative content of the constitutional text is vague" enough to permit multiple reasonable conclusions about the original meaning of North Carolina's executive power. Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 Fordham L. Rev. 453, 502 (2013). The underlying "interpretation–construction distinction" is a compelling principle of but ultimately parenthetical to my broader point here. *Id.* at 490–94, *contested in* Scalia & Garner, *Reading Law* 13–15. *See generally* Keith E. Whittington, *Constitutional Construction: Divided Powers and Constitutional Meaning* 208 (1999) (defining "construction" as "realiz[ation through] . . . political practice" of "a denser web of values, institutions, procedures, and rights" "established by the constitutional text").

Ct. App. Aug. 6, 2025), of only *administrative departments* and not *offices of the State*, N.C. Const. art. III, § 11. Administrative law being largely a New Deal creation, these two latter Clauses may have materially distinct historical pedigrees relative to their respective *major purposes*. *See* Samuel Estreicher & David L. Noll, *Legislation and the Regulatory State* 445–48 (3d ed. 2022).

I also agree our Constitution "contemplate[s]" "th[is] mere reallocation of . . . authority within the Council of State," *Stein*, 387 N.C. at 581 (Berger, J., concurring), but could see an implicit "play in the joints" between the Executive Vesting and Administrative Reorganization Clauses, *cf. Locke v. Davey*, 540 U.S. 712, 718 (2004). The "portfolio of responsibilities" "for disfavored members of the Council" are indeed "gutt[able] by legislative fiat" (subject to a presumably overridden veto). *Stein*, 387 N.C. at 592 (Earls, J., dissenting); *accord N.C. Const. Report* 104 ("in a moment of rashness"). And an "ultimate responsibility" for law enforcement does not mean a *singular* one. *Cooper*, 371 N.C. at 799. *Contrast Ultimate*, *Black's Law Dictionary* (4th ed. 1968) ("[L]ast in the . . . sequence tended toward by all that precedes . . . ."), *with Singular*, *id.* ("Unitary; . . . affecting only one person . . . ."). While Plaintiff is "vested" with "[t]he executive power of the State," Article III's specific enumeration of those substantial gubernatorial powers may imply a limitation to them alone. N.C. Const. art. III, § 1. But because the majority's well-reasoned opinion recognizes the breadth and limitations of the General Assembly's power to alter the Executive Branch's own powers, I, with this further explanation, concur in full.